In re Robert Burns JENSEN, Rosemary Tooker Jensen, Debtors.

Robert Burns JENSEN and Rosemary Tooker Jensen, aka Rosemary Paula Jensen, aka Rosemary Paula Kitchen, Appellants,

v.

CALIFORNIA DEPARTMENT OF HEALTH SERVICES, Appellee.

BAP No. EC 90–1655–AsMeO.

Bankruptcy No. 284–00512–A–7.

Adv. No. 289–0147.

United States Bankruptcy Appellate Panel, of the Ninth Circuit.

Argued and Submitted March 21, 1991.

Decided May 15, 1991.

Terrance L. Stinnett, San Francisco, Cal., for appellants, Robert and Rosemary Jensen.

Margarita Padilla, San Diego, Cal., for appellee, California Dept. of Health Services.

Before ASHLAND, MEYERS and OLLASON, Bankruptcy Judges.

## OPINION

ASHLAND, Bankruptcy Judge.

The debtors Robert and Rosemary Jensen ("Jensens") appeal the bankruptcy court's grant of summary judgment in favor of the State of California Department of Health Services ("DHS"), the California counterpart to the federal Environmental Protection Agency, upon the parties' cross-motions for summary judgment. We reverse.

## INTRODUCTION AND FACTS

The Jensens individually wholly-owned Jensen Lumber Company ("JLC"), whose manufacturing process included dipping logs in fungicide tanks. DHS generally seeks indemnity for cleanup costs incurred related to the fungicide tanks, which remained on property (the "site") leased and later abandoned in bankruptcy by JLC. The California Regional Water Quality Control Board (the "Board") inspected the site on January 25, 1984 and issued a letter, received by the Jensens on February 2, stating a hazardous waste problem existed at the site. The Jensens thereafter individually filed bankruptcy under Chapter 7 on February 13, 1984. They did not list any claim for hazardous waste cleanup. The DHS later became involved in March, 1984 but did not expend funds for hazardous waste cleanup until substantially after that time.

Following the determination that no assets were available for distribution to creditors, the Jensens received a discharge on July 16, 1984. The Jensens filed an adversary proceeding on April 24, 1989, to determine that the DHS's claim for cleanup costs was discharged in the Jensen's individual bankruptcy, after the DHS had taken steps seeking recovery under the federal and state "Superfund" statutes, CERCLA [1] and HSA [2], respectively. A more complete chronology of relevant events surrounding the Chapter 7 bankruptcies of JLC (converted from Chapter 11) and the

---

**1.** The Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601–9657.

**2.** The Hazardous Substance Account Act, Cal. Health and Safety Code §§ 25300 et seq.

Jensens as individuals appends this decision.

## ISSUE PRESENTED

This case requires us to determine when claims arise for purposes of bankruptcy, specifically claims under CERCLA and HSA. As a preliminary matter, we note the DHS does not contend its claim is excepted from discharge. Rather, the DHS asserts its claim arose postpetition and is therefore not discharged. Thus, the sole issue as framed by the parties, and as addressed by the bankruptcy court, 114 B.R. 700, concerns *when* DHS's claim arose for purposes of bankruptcy.

## STANDARD OF REVIEW

The issue presented involves an interpretation of law by the bankruptcy court, which we review *de novo*. *In re Tompkins*, 95 B.R. 722, 723 (9th Cir.BAP 1989); *In re Orvco, Inc.*, 95 B.R. 724, 726 (9th Cir.BAP 1989). The facts as set forth in the appendix are essentially undisputed.

## DISCUSSION

A. *11 U.S.C. § 101(4) defines claims for bankruptcy purposes and legislative history mandates a broad interpretation of this definition.*

A claim for purposes of bankruptcy is defined at 11 U.S.C. § 101(4) (1988) as follows:

(4) "claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

■ Congress has expressed a clear intention that the definition of claim be interpreted broadly. H.R.Rep. No. 595, 95th Cong., 1st Sess. 309, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6266, states: "The bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." The Senate commented similarly. "The effect of the definition is a significant departure from present law.... By this broadest possible definition and by use of the term throughout the title 11 ... the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court." S.Rep. No. 989, 95th Cong., 2d Sess. 21–22, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5807–08. *See also In re Bullion Reserve of North America*, 836 F.2d 1214, 1218 (9th Cir.1988). While all courts generally acknowledge the definition of claim should be interpreted broadly, the issue remains exactly how broad.

B. *The Supreme Court precedents do not address the discrete issue of when a claim arises for purposes of bankruptcy.*

The parties and the bankruptcy court rely to varying degrees on two recent Supreme Court cases addressing environmental issues in the context of bankruptcy. In *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the State of Ohio had obtained, prior to debtor's bankruptcy, an injunction ordering the debtor to clean up hazardous waste residing on debtor's property. After the debtor filed the petition, the State filed a complaint against the debtor seeking a declaration that the debtor's obligation under the injunction was not dischargeable. The State argued the injunction did not constitute a "debt" or "liability on a claim" as defined in the Bankruptcy Code and thus was not dischargeable. The Supreme Court rejected this argument, holding the State sought the equivalent of a monetary payment within the definition of claim, and the obligation was thus dischargeable in bankruptcy. *Id.*

at 283, 105 S.Ct. at 709. While holding the environmental obligation constituted a dischargeable claim, *Kovacs* nevertheless did not address when such claims arise for bankruptcy purposes. *Id.* at 284, 105 S.Ct. at 710. We find *Kovacs* inapposite for this reason.

*Midlantic National Bank v. New Jersey Dept. of Environ. Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), also involved environmental obligations in bankruptcy. At issue in *Midlantic* was whether the trustee's powers permitted abandonment of property of the debtor contaminated with hazardous waste. *Id.* at 496, 106 S.Ct. at 757. The Supreme Court examined the scope of the trustee's powers in light of Congressional intent and case precedent. The court held that a trustee in bankruptcy may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health and safety, here state environmental laws. *Id.* at 506–507, 106 S.Ct. at 762. The Supreme Court concluded the property must be either sold or cleaned up. The Court took a narrow view of the trustee's powers to force cleanup of the hazardous waste. However, this interpretation of the trustee's powers does not decide when a bankruptcy claim arises. For this reason, we find *Midlantic* to be likewise inapposite.

### C. Three points of origination find authoritative support.

Authority generally supports three points of origination for claims, each of which is advocated by one or the other parties in the present case. The cases hold bankruptcy claims may arise: (1) with the right to payment; (2) upon the establishment of the relationship between the debtor and the creditor; or (3) based upon the debtor's conduct. Following the foregoing examination of each theory, we hold the DHS's claim arose for purposes of the Jensens' bankruptcy at the time of actual or threatened release of the hazardous waste, or based upon the debtors' conduct.

### 1. The claim arises with the right to payment.

DHS contends and the bankruptcy court held that DHS's claim did not arise until DHS incurred costs for hazardous waste cleanup. DHS argues and the bankruptcy court held that § 101(4) specifically requires a "right to payment" before a claim cognizable in bankruptcy arises. The argument then proceeds that the right to payment under CERCLA or HSA does not arise until cleanup costs are incurred. DHS thus argues that until cleanup costs are incurred, no right to payment, and no cognizable claim, exists for bankruptcy purposes.

This theory has been adopted by at least one circuit court. In *In re Frenville,* 744 F.2d 332 (3rd Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985), a creditor appealed a district court order holding the creditor's indemnity action against the Chapter 7 debtor was barred by the automatic stay. While the debtor's acts underlying the indemnity occurred prepetition, the suit against the creditor was filed postpetition, prompting the indemnification action. In determining when the claim originated, the Third Circuit first noted the Bankruptcy Code does not clearly define when a "right to payment" arises, and therefore applied state law. *Id.* at 337. The relevant state law declared a right to payment on an indemnity arises upon payment of the judgment flowing from the act. The *Frenville* court then concluded the suit against the creditor had been filed postpetition, the creditor's claim therefore arose postpetition, and the automatic stay did not apply. *Id.* The court in *United States v. Union Scrap Iron & Metal,* 123 B.R. 831 (D.Minn.1990), cited by the DHS, adopted the same reasoning, although without mention of *Frenville.*

However, *Frenville* has been roundly criticized by several courts. As stated in *In re A.H. Robins Co.,* 63 B.R. 986, 992 (Bankr.E.D.Va.1986), the *Frenville* court confuses "a 'right to payment' for federal bankruptcy purposes with the accrual of a cause of action for state law purposes." Indeed, under *Frenville* and *Union Scrap*

*Iron* we can perceive no difference between claims inside or outside bankruptcy. Such an interpretation simply is unwarranted from a reading of § 101(4), which includes *contingent* and *unmatured* rights to payment, as well as those having been reduced to judgments.

Further, holding that the cause of action, or in the present case, the statutory right to payment, triggers recognition of the bankruptcy claim contravenes the overriding goal of the Bankruptcy Code to provide a "fresh start" for the debtor. *Grogan v. Garner*, — U.S. —, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). In a no-asset Chapter 7 case, like the one at hand, manipulation will surely result. The creditor, aware of a debtor's precarious financial situation, will delay expenditures in anticipation of the debtor's bankruptcy, thereby preventing discharge of the creditor's claims. Additionally, debtors having attentive creditors will be denied the benefit of bankruptcy's fresh start, although enjoyed by other debtors similarly situated but whose creditors are less well-informed. Such untenable results cannot be endorsed.

DHS offers cases which hold private causes of action under CERCLA do not arise until cleanup costs are incurred. *See Levin Metals Corp. v. Parr–Richmond Terminal Co.*, 799 F.2d 1312, 1316 (9th Cir.1986); *Bulk Distribution Centers, Inc. v. Monsanto Co.*, 589 F.Supp. 1437, 1450–1452 (S.D.Fla.1984). However, neither of these cases involved bankruptcy nor required determination of when a bankruptcy claim arises, but rather only determined that a private action under CERCLA could not be *commenced* prior to incurrence of cleanup costs. We conclude reliance on these cases is misplaced.

Other cases cited by DHS and the bankruptcy court appear equally inapposite. In *In re Hemingway Transport, Inc.*, 73 B.R. 494 (Bankr.D.Ma.1987), plaintiff in the adversary proceeding had purchased property from the bankruptcy trustee, property later determined to be contaminated with hazardous waste. The plaintiff was forced to clean up the waste and sought indemnification from the estate, specifically asserting administrative priority for its claim. While the court held plaintiff's claims were entitled to administrative expense priority, the court cited cases holding that negligence of a trustee or receiver gives rise to administrative priority claims. *Id.* at 504–505. The court relied heavily on equitable considerations, evidenced by the following statement:

> Not only is the Court moved by the concept of fairness emphasized by the Supreme Court and the First Circuit Court of Appeals, it is moved by its awareness that [other courts have] frowned on the notion of a debtor attempting to transfer its liability or potential for liability under state or federal environmental laws.

*Id.* at 505. *In re Wall Tube & Metal Products Co.*, 831 F.2d 118 (6th Cir.1987), generally follows the same vein. While the DHS argues these decisions implicitly determined the claims at issue were postpetition, thus justifying administrative expense priority, neither case mentions § 101(4) or addresses the subject of when bankruptcy claims arise. We conclude these cases are inapposite to the present appeal.

2. The claim arises upon the establishment of the relationship between the debtor and the creditor.

DHS alternatively asserts bankruptcy claims arise at the earliest point in the relationship between the debtor and the creditor. Adopting this theory would benefit DHS in that DHS did not become involved until after the filing of the Jensens' individual bankruptcy, causing DHS's claims to be postpetition.

Often cited in this respect is *In re Edge*, 60 B.R. 690 (Bankr.M.D.Tenn.1986). *Edge* involved prepetition negligence of two debtor dentists not discovered until postpetition. The plaintiff sought a declaration that her claim arose upon discovery of the injury and therefore was not subject to the automatic stay. After a thorough discussion, the court rejected the *Frenville* reasoning and held a claim resulting from debtor's prepetition misconduct arises at the earliest point in the relationship between the victim and the wrongdoer, in this case when the dentist performed the negli-

gent act. *Id.* at 699. In so concluding, the court stated:

> These are individual Chapter 7 cases. A fresh start for these debtors is impossible if the victims of prebankruptcy negligence cannot be addressed in this case. Allowing those injured by the debtor's prepetition conduct to share in prepetition assets is consistent with the strong policy favoring compensation for injuries and is essential to the equitable distribution of these estates.

*Id.* at 699–700. Thus, the *Edge* court believed that recognition of prepetition negligence provided a fresh start to the debtor and compensated the victim from the estate. *Id.* at 699.

While we find *Edge* persuasive, we also believe the *Edge* reasoning to be consistent with the proposition, which we adopt below, that the creditor's claim arises based upon the debtor's conduct. *Edge* simply applies the proposition in the context of a tort committed while rendering services.

### 3. The claim arises based upon the debtor's conduct.

■ The final theory, that the bankruptcy claim arises based upon the debtor's conduct, we believe most closely reflects legislative intent and finds the most support in the case law. These cases have generally held the bankruptcy claim arises upon conduct by the debtor which would give rise to a cause of action, if other elements may later be satisfied. A brief review of frequently cited cases supporting this approach follows.

In *In re Johns–Manville Corp.*, 57 B.R. 680 (Bankr.S.D.N.Y.1986), creditors, not asbestos-related, seeking indemnity or contribution from debtor Johns–Manville, moved for relief from the stay to pursue their claims in state court. This necessitated interpreting § 101(4) as to when bankruptcy claims arise. The bankruptcy court denied the relief from stay, noting "... the focus should be on the time when the acts giving rise to the alleged liability were performed ..." *Id.* at 690. The court found the operative time to be the sale of the defective goods by Johns–Manville to

the creditors, which occurred prepetition. *Id.* Significantly, the *Johns–Manville* court was concerned with the policy of basing timing of claims on factors other than the debtor's conduct. "Procedural and extraneous factors such as the timing of the filing of a summons and complaint by a third party, which is not associated with the underlying nature of the cause of action ... simply should not determine the existence or nonexistence of a 'claim'." *Id.*

The bankruptcy court in *In re A.H. Robins Co.*, 63 B.R. 986 (Bankr.E.D.Va.1986), reached a similar conclusion. There, a Dalkon Shield claimant sought a declaration that her claim against the debtor manufacturer was postpetition and thus not subject to the automatic stay. The claimant had been inserted with the shield prepetition, but perceived no injury until postpetition. In analyzing when the bankruptcy claim arose, the *A.H. Robins* court rejected the reasoning in *Frenville* and found the definition of claim articulated in *Edge* broader than necessary to give effect to Bankruptcy Code goals. *Id.* at 993. The court then adopted the theory in *Johns–Manville*, that a "right to payment", and therefore a claim, arises at the time when the acts giving rise to the alleged liability were performed. *Id.* The *A.H. Robins* court held the right to payment arose at the time the shield was inserted. *Id.*

One bankruptcy court has applied the reasoning of *Johns–Manville* and *A.H. Robins* to environmental claims. In *In re Chateaugay Corp.* ("*LTV*"), 112 B.R. 513 (Bankr.S.D.N.Y.1990), the United States and New York State sought declaratory judgments regarding dischargeability of environmental claims in bankruptcy. The bankruptcy court examined the language of CERCLA, which requires as a predicate to liability "[a] 'release' or a 'threatened release' of a 'hazardous substance' ... at the site." *Id.* at 518. The *LTV* court held so long as a prepetition triggering event has occurred, i.e. the release or threatened release of hazardous waste, the claim is dischargeable, regardless of when the claim for relief may be in all respects ripe for adjudication. *Id.* at 522. As the *LTV*

court states, very frequently only one part of a tort occurs prepetition, with the injury occurring postpetition, yet such claims should be considered dischargeable. *Id. Accord In re Hudson Oil Co.*, 100 B.R. 72, 77 (Bankr.D.Kan.1989).

We adopt the reasoning propounded in *Johns–Manville* and *A.H. Robins*, as applied in *LTV*. DHS attempts to distinguish *LTV* by noting an extensive relationship existed between the *LTV* parties prior to the bankruptcy filing. This argument is unpersuasive and overlooks the plain holding of *LTV* that a claim arises for purposes of discharge upon the actual or threatened release of hazardous waste by the debtor. *LTV* is directly analogous to the present case and we subscribe to its sound reasoning. This conclusion gives effect to the important bankruptcy goal of providing a fresh start to the debtor and discourages manipulation of the bankruptcy process.

*D. Environmental policy considerations may not control the Bankruptcy Code in the absence of clear legislative intent.*

■ The bankruptcy court and DHS further contend that important public policy supporting environmental cleanup requires that environmental claims be treated differently from other claims. This argument ignores the only Ninth Circuit authority in this area, *In re Dant & Russell, Inc.*, 853 F.2d 700 (9th Cir.1988). At issue there was whether *private* claims against the debtor under CERCLA could be accorded administrative expense priority. In holding the priority sought not merited, the Ninth Circuit sounded a strong policy against according preference to particular claims, "Although [the creditor] asserts that public policy considerations entitle its claims for cleanup costs to administrative expense priority, we acknowledge that Congress alone fixes priorities ... (citation omitted.) Courts are not free to formulate their own rules of super or sub-priorities within a specifically enumerated class." *Id.* at 709. While not addressed in determining the timing of a claim, the *Dant* court's language clearly discourages according preference to particular claims.

CONCLUSION

Based upon the Board letter dated February 2, 1984, threatened release of the hazardous waste involved here clearly occurred prior to filing of the Jensens' individual bankruptcy on February 13, 1984. Because we hold claims in bankruptcy arise based upon the debtor's conduct, we conclude that DHS's claim arose in this case prepetition, and was therefore discharged in the Jensens' bankruptcy. The decision of the bankruptcy court is reversed.

APPENDIX

2/83—JLC commenced operations, capitalized in substantial part by Bank of America ("B of A") loan in the amount of $750,000.

11/83—JLC defaulted on loan covenants; B of A demanded payment of all outstanding amounts.

12/2/83—JLC filed voluntary petition under Chapter 11. B of A subsequently took control of JLC and liquidated all assets.

1/25/84—Albert Wellman, engineer for the Board, inspected the JLC site.

2/2/84—The Jensens received a letter from Wellman stating a potential hazardous waste problem existed at the site.

2/10/84—The Jensens' attorney informed Wellman by letter that JLC had filed a Chapter 11 petition, virtually certain to be converted to Chapter 7, and that JLC had no available funds for site cleanup.

2/13/84—The Jensens filed a joint voluntary petition in bankruptcy under Chapter 7. The schedule of liabilities filed did not include any costs for potential site cleanup.

2/24/84—First notice of creditors' meeting in the Jensens' individual bankruptcy.

3/84—The Board requested assistance from DHS, the California equivalent of the EPA.

3/20/84—JLC's Chapter 11 case converted to Chapter 7.

5/18/84—Cinder block dip tank emptied under DHS supervision.

7/16/84—The Jensens were released from all dischargeable debts in their personal Chapter 7 case.

2/20/85—The Jensens' personal bankruptcy closed with no assets being distributed to creditors.

4/4/85—EPA representatives discovered the front and right sides of the tank had been removed by persons unknown.

3/18/87—JLC Chapter 7 case was closed.

3/30/87—DHS informed Robert Jensen he was individually responsible for hazardous waste cleanup at the site.

3/31/87—Robert Jensen received a notice declaring him to be jointly responsible with the property owners for site cleanup.

4/87—Three letters were sent from Robert Jensen's attorneys to the DHS, informing DHS that the Jensens no longer had control of the site and had long since terminated their possession, also requesting Robert Jensen be removed from the list of potentially responsible parties.

6/15/87—DHS informed Jensen that responsible parties may only contest DHS determinations following preliminary allocation of financial responsibility in the forthcoming Remedial Action Plan ("RAP").

7/17/87—DHS responded to Jensen's assertion that any liability was discharged by the Jensens' bankruptcy, stating the liability arose postpetition.

6/24/88—The Toxic Substances Control Division of the DHS issued a draft RAP, assessing responsibility for site cleanup 10 percent to the Jensens.

10/88—Final RAP issued with no substantive changes to previous plan.

Unclear—The Jensens moved to reopen their Chapter 7 case to list as creditors the DHS and owners of the site.

4/24/89—The Jensens filed an adversary proceeding to determine that the DHS claim was prepetition and therefore discharged.

12/18/89—Cross-motions for summary judgment heard.

5/10/90—Bankruptcy court issued Memorandum Opinion and Decision granting the DHS motion and denying the Jensens' motion for summary judgment.