In re Richard Delmon CLEMENT and Jacqueline Clement, Debtors.

Arnold WEINER, an individual doing business as Alway Financial, Plaintiff,

v.

Jacqueline CLEMENT, Defendant.

Bankruptcy SB89–01561 MG.
Adv. No. SB89–0242 MG.

United States Bankruptcy Court,
C.D. California.

Feb. 5, 1992.

**558**

Travis & Travis, Grand Terrace, Cal., for Jacqueline Clement.

David M. Marcus, Marian Gahagan, Hirschman & Marcus, Los Angeles, Cal., for Arnold Weiner.

## MEMORANDUM OF DECISION

MITCHEL R. GOLDBERG, Bankruptcy Judge.

### FACTS

On January 4, 1989,[1] Raymond Dyes, as pastor of the First Baptist Missionary Church ("Dyes"), entered into a contract with Arnold Weiner, an individual doing business as Alway Financial ("Alway Financial" or "Weiner"), to obtain a loan in the amount of $210,000.00. The loan was to be secured by certain real property owned by Dyes. Dyes signed a loan proceeds disbursements and payment instruction ("January instruction") authorizing $15,000.00 to be disbursed to Alway Financial. Thereafter, Dyes elected not to borrow the money but to sell the real property. On February 8th, Alway Financial opened

escrow # 1716 with First Escrow Company, Inc. ("First Escrow"). Jacqueline Clement ("Debtor") was the escrow officer for the sale. The January instruction was presented to First Escrow sometime after February 8th.

On February 24th, an amendment to the January instruction, signed by both Dyes and Weiner, was presented to First Escrow (the "February amendment"). The February amendment adjusted the amount to be disbursed to Alway Financial from $15,000.00 to $10,000.00. Three days later, on February 27th, Debtor and her husband, Richard Delmon Clement, filed a Joint Petition for Relief under Chapter 7 of the United States Bankruptcy Code. Neither Alway Financial nor Weiner were listed as creditors.

Escrow closed on April 5th and Debtor prepared a check for $10,000.00 payable to Alway Financial. On April 10th Dyes instructed Debtor in writing that the "payoff check to Alway Financial ... [would] be held by ... Dyes." Debtor withheld the check and turned over the proceeds to Dyes without the consent of Alway Financial. On April 21st, Debtor and her husband amended their Schedule A-3 (creditors having unsecured claims without priority) to include, amongst others, "Arnold Weiner dba Always [sic] Financial ... Re: Possible litigation."

Alway Financial filed its Complaint on June 5, 1989 alleging that Debtor's conduct was fraudulent and, therefore, the debt owed by Debtor to Alway Financial was non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Debtor filed her Answer on July 6th, generally denying all allegations set forth in the Complaint. On January 3, 1991, Alway Financial filed its Pre-Trial Conference Statement presenting the additional legal issue of whether the $10,000.00 debt was a post-petition debt and, therefore, not dischargeable in bankruptcy pursuant to 11 U.S.C. § 727(b).

The Court heard testimony on the question of liability on February 15, 1991. The evidence presented did not show that

1. All dates, unless otherwise stated, refer to   1989.

§ 523(a)(2)(A) would apply. On the Court's instruction, the parties filed post-trial briefs ("briefs") addressing the issue of whether such debt was a pre-petition debt or a post-petition debt.

In its brief Alway Financial argued that although the February amendment instructing Debtor to pay the disputed sum to Alway Financial was executed pre-petition, the actual obligation to pay that money did not arise until after escrow closed on April 5th. Alway Financial contends that since the obligation arose after the petition was filed on February 27th, the debt is post-petition and, therefore, not dischargeable in bankruptcy.

In opposition, Debtor argued that once the February amendment was presented it legally bound Debtor to honor the claim in escrow and gave Alway Financial an immediate right to payment, contingent only upon the close of escrow. Debtor contends that since the February amendment was presented pre-petition, the debt arose pre-petition and, therefore, is properly dischargeable in bankruptcy.

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1334 (District Courts have original and exclusive jurisdiction of all cases under Title 11), and 28 U.S.C. § 157(a) (District Courts may refer all Title 11 cases and proceedings to the Bankruptcy Judges of the Central District of California). This action constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts).

## DISCUSSION

11 U.S.C. § 727(b) provides:

Except as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from *all debts that arose before the date of the order for relief* under this chapter[.] (Emphasis added)

This language raises three issues: (1) what is the date of the order for relief; (2) what constitutes a "debt" in bankruptcy; and (3) when does a "debt" arise for the purpose of discharge under 11 U.S.C. § 727(b).

I. What is the Date of the Order for Relief?

█ Under 11 U.S.C. § 301 "[a] voluntary case under a chapter of this title is commenced by the filing with the bankruptcy court of a petition under such chapter by an entity that may be a debtor under such chapter. The commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter." Debtors herein commenced their case when they filed their petition on February 27, 1989.

Bankruptcy Rule 1009 states: "[a] voluntary petition, ... schedule, ... may be amended by the debtor as a matter of course at any time before the case is closed." "Thus, while a debtor may schedule a creditor who was not included in the original schedule, the amendment would not necessarily bring that debt under the protection of the general discharge." Bankr.R. 1009 (Norton 1991) (Editors' Comment). Although Debtors amended their schedules on April 21, 1989, the amendment did not alter the date of the order for relief. It remained February 27, 1989. The amendment did not bring the date of the order for relief forward to April 21st. Any dischargeable debt would be one, whenever scheduled, which arose prior to the February 27th date of filing.

II. What Constitutes a "Debt" in Bankruptcy?

█ 11 U.S.C. § 101(12) defines "debt" as liability on a claim. The House and Senate Reports to the Reform Act of 1978 state: "[t]he terms 'debt' and 'claim' are coextensive: a creditor has a 'claim' against the debtor; the debtor owes a 'debt' to the creditor." S.Rep. No. 989, 95th Cong., 2d Sess. 23 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 5809. 11 U.S.C. § 101(5)(A) defines claim as:

... [a] right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]

Congress has expressed its clear intention that in bankruptcy the definition of "claim" is to be interpreted broadly. *In re Jensen*, 127 B.R. 27, 29 (9th Cir.BAP 1991) (citing to 1978 U.S.Code Cong. & Admin.News, 5787, 5807–08, 5963, 6266). Although disputed, Alway Financial's claim falls under 11 U.S.C. § 101(5)(A).

III. When does the Claim Arise for the Purpose of Discharge Under 11 U.S.C. § 727(b)?

■ In a recent decision the Bankruptcy Appellate Panel (the "BAP") thoroughly reviewed the issue of when a claim arises for the purposes of bankruptcy. *In re Jensen*, 127 B.R. 27 (9th Cir.BAP 1991). The BAP analyzed three different theories for when such claims arise: (1) with the right to payment; (2) upon the establishment of the relationship between the debtor and the creditor; and (3) based upon the debtor's conduct. After careful analysis of all three theories, the BAP concluded that the third theory, that a claim arises based upon the Debtor's conduct, is the proper law in this Circuit. *Jensen*, 127 B.R. at 32. *See also In re Johns–Manville Corp.*, 57 B.R. 680, 690 (Bankr.S.D.N.Y.1986) ("focus should be on the time when the acts giving rise to the alleged liability were performed"); *In re A.H. Robins*, 63 B.R. 986, 993 (Bankr.E.D.Va.1986) ("a 'right to payment,' and therefore a claim, arises at the time when the acts giving rise to the alleged liability were performed.")

*Jensen*, supra, involved a claim for clean-up costs for certain hazardous materials on the leased property of Debtor's bankrupt corporation. The Jensens owned a lumber company since February 1983 whose procedure it was to dip logs in fungicide tanks. In December 1983, the company filed bankruptcy and abandoned the tanks. Shortly before the Jensens' personal Chapter 7 filing in February 1984, the site was inspected by the California Regional Water Control Board and a letter was issued stating that a hazardous waste problem existed at the site. The hazardous waste problem arose prior to the filing of Debtor's petition, but the clean-up was conducted post-petition by the California Department of

Health Services. After reviewing the three theories, and accepting the third, the *Jensen* Court, in focusing on its own facts, followed the holding in *In re Chateaugay Corp. ("LTV")*, 112 B.R. 513 (Bankr. S.D.N.Y.1990), that "a claim arises for purposes of discharge upon the actual or threatened release of hazardous waste by the debtor." *Jensen*, supra, at 33. The BAP held that the hazardous waste was released pre-petition and, therefore, the claim for clean-up costs of the waste arose pre-petition. The conduct which gave rise to the cause of action in *Jensen* was not merely owning a company which used fungicide tanks, or the use of fungicide tanks in business generally. The conduct in question was the threatened release of the hazardous waste due to the abandonment of the tanks from the close of business following the business bankruptcy. Before such threatened release, there was no conduct which gave rise to a cause of action against the Jensens.

In the pre-*Jensen* case of *In re Christian Life Center*, 821 F.2d 1370 (9th Cir. 1987), wherein the Court implicitly set down the "conduct" standard, church officers sold shares in a certain "trust fund" for church construction. The church failed to register the shares as security and in 1978 it was ordered to cease and desist. Investors who failed to recover their money brought suit against the church, its officers, and its pastor, Reverend Argue. In 1979, the church filed a petition under Chapter 11 and the suit was converted to an adversary proceeding. The attorneys who defended Reverend Argue and the officers on behalf of the church submitted a claim against the estate for indemnity of defense costs. In determining whether the claim was entitled to an administrative priority status, the Court said:

> [Reverend] Argue was sued for his *pre-petition actions of setting up and administering the trust fund.* Any duty of the church to reimburse or indemnify Argue for his legal expenses arises from these pre-petition services. As such LDC's legal fees claim arises from Argue's pre-petition services to the corpora-

tion rather than any post-petition services. Thus LDC's claim is at most a general unsecured claim not entitled to administrative priority ... It makes no difference that the duty to indemnify Argue for litigation expenses, if such duty exists, did not accrue until after the petition was filed when Argue incurred those expenses; *the critical fact is that the claim for indemnity arose from pre-petition services Argue provided the corporation.*

The pre-petition services that Reverend Argue provided to the corporation, which gave rise to the cause of action, were the selling of unregistered trust fund shares for church construction.

As the reported cases demonstrate, it was not simply being the pastor or attempts to raise money for church construction which was the wrongful conduct. It is not just any conduct by a Debtor which will be cited as the basis for a cause of action. Certain wrongful conduct must be present. In *In re Christian Life Center*, the wrongful conduct was the selling of unregistered shares. In *Jensen*, the wrongful conduct was the abandonment of certain fungicide tanks which created a threatened release of hazardous waste. Thus, the test of when a claim in bankruptcy arises is based upon specific conduct of a debtor which gives rise to a cause of action. In analyzing the case at bar, we must turn to California escrow law to determine whether the "conduct" herein was the pre-petition act of opening the escrow, or the post-petition failure to pay Alway Financial the $10,000.00 on the close of escrow.

California Finance Code § 17003 provides:

"Escrow" means any transaction wherein one person, for the purpose of effecting the sale, transfer, encumbering, or leasing of real or personal property to another person, delivers any written instrument, money, evidence of title to real or personal property, or other thing of value to a third person to be held by such third person until the happening of a specified event or the performance of a prescribed condition, when it is then to be delivered by such third person to a grantee, grantor, promisee, promisor, obligee, obligor, bailee, bailor, or any agent or employee of any of the latter.

*Kirby v. Palos Verdes Escrow Co., Inc.*, 183 Cal.App.3d 57, 227 Cal.Rptr. 785 (1st Dist.1986), addressed the issue of the liability of an escrow agent for his or her actions. In *Kirby*, Mr. and Mrs. Pierce opened an escrow with Palos Verdes Escrow to purchase certain real property. While awaiting permanent financing from the Small Business Administration, the Pierces took out a short term loan from Universal Financial ("Universal"), which loan was secured by a second deed of trust on the property. Universal assigned the note and deed of trust to the Kirbys and recorded the documents on October 24, 1980. Permanent funds were deposited into the escrow in December, 1980. Thereafter, Universal made a demand for payment at Palos Verdes' request. The Pierces verbally authorized the payment, and payment was made. In February, 1981, the Kirbys demanded payment from Universal Financial. When payment was not made, the Kirbys filed suit against Palos Verdes Escrow for negligent performance of its escrow duties. *Kirby*, supra, 227 Cal.Rptr. at 787. "An escrow holder is the limited agent and fiduciary of all parties to an escrow ... A failure to exercise reasonable skill and diligence in carrying out the escrow instructions subjects the escrow holder to liability." *Kirby*, supra, 227 Cal. Rptr. at 789. The *Kirby* court held:

[R]eceipt of notice of the assignment was equivalent to the receipt of new escrow instructions regarding the party to be paid ... Such "new" instructions conflicted with the Pierces' verbal instructions to pay Universal. *This conflict should have alerted defendant to a potential problem in paying Universal rather than the Kirbys,* and vice versa. *As an escrow agent faced with conflicting instructions, Palos Verdes had the duty to delay payment of the escrow funds until such time as the proper payee was identified.* (emphasis added)

*Kirby*, supra, 227 Cal.Rptr. at 790.

In the case at bar, according to the February amendment, First Escrow was to pay

Alway Financial $10,000.00. Debtor prepared a check for that amount and was ready to present it to Weiner on April 10th until she was presented with the contradictory instruction signed by Dyes. At that moment, Debtor should have been on notice that a potential problem in disbursing the proceeds existed. It may have been her duty to hold the proceeds until the proper payee was identified. By distributing the proceeds to Dyes, Debtor may have breached her fiduciary duty to Weiner. It was at that point when the claim in bankruptcy arose.

Debtor cites no authority, and independent research has found none, which suggests that the mere opening of an escrow subjects an escrow agent to liability. Although the escrow was opened pre-petition, the mere opening of the escrow and the pre-petition acceptance of the January instruction and the February amendment were not the acts which gave rise to the cause of action. Debtor was not asked to disburse the money pre-petition. On February 27th, Alway Financial had no actual or potential cause of action against Debtor. It was with Debtor's disbursal of the $10,000.00 to Dyes on April 10, 1989, some one and one-half months after Debtor filed her bankruptcy petition, that Alway Financial's claim first arose.

## CONCLUSION

The claim of Alway Financial is not subject to discharge in the Clement bankruptcy as it arose post-petition. The right, if any, of Alway Financial as well as the defenses, if any, of Clement must be resolved in state court. This Memorandum Decision constitutes my Findings of Fact and Conclusions of Law. Counsel for Alway Financial shall prepare, serve and lodge an order that its debt is not a debt dischargeable under 11 U.S.C. § 727(b).