In re Robert Burns JENSEN; Rosemary
Tooker Jensen, Debtors.

CALIFORNIA DEPARTMENT
OF HEALTH SERVICES,
Appellant,

v.

Robert Burns JENSEN; Rosemary
Tooker Jensen, Appellees.

No. 91–15879.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 14, 1993.

Decided June 15, 1993.

Timothy R. Patterson, Deputy Atty. Gen.,
San Diego, CA, for appellant.

Terrance L. Stinnett, Goldberg, Stinnett &
MacDonald, San Francisco, CA, for appellees.

D.J. Baker, Weil, Gotshal & Manges,
Houston, TX, David R. Berz and David B.
Hird, Weil, Gotshal & Manges, Washington,
DC, for amici curiae Circle K. Corp. and
affiliates.

Ward T. Kelsey, Asst. Counsel, for amicus
curiae Commonwealth of Pennsylvania.

R. Claire Guthrie, Deputy Atty. Gen., for amicus curiae Commonwealth of Virginia.

Beryl I. Dulsky, Asst. Atty. Gen., for amicus curiae State of Ariz.

Beverly Yale Pfeiffer, Asst. Atty. Gen., for amicus curiae State of OH.

Brian Chally, Senior Deputy Atty. Gen., for amicus curiae State of Nev.

Tom Udall, Atty. Gen., for amicus curiae State of N.M.

Brian J. Zwit, Asst. Atty. Gen., for amicus curiae State of Tex.

Before ALDISERT,* GOODWIN, and FLETCHER, Circuit Judges.

PER CURIAM:

The California Department of Health Services ("California DHS") appeals the decision of the Bankruptcy Appellate Panel that its claim against Robert Burns Jensen and Rosemary Tooker Jensen for cleanup of hazardous waste at the Jensen's former business property was discharged in the couple's bankruptcy. We have jurisdiction over California DHS's timely appeal pursuant to 28 U.S.C. § 158(d) (1988). We affirm.

I. Facts

A decade ago, the Jensens owned a closely-held corporation called the Jensen Lumber Co. ("JLC") and briefly operated its lumber business.[1] On December 2, 1983, JLC filed a voluntary Chapter 11 bankruptcy petition; the company had been in business only since May 1983.

Several weeks after the petition was filed, on January 25, 1984, an inspector from the California Regional Water Quality Control Board ("California Water Board") visited the inactive JLC site and noticed a large, cinder-block tank. The tank contained about 5,000 gallons of a lumber fungicide. JLC had used the "dip tank" and fungicide solution to treat the lumber it processed. The solution contained toxic chlorinated phenols (including pentachlorophenal, or "PCP").

By letter dated February 2, 1984, the California Water Board inspector expressed his concern to Robert Jensen that any release of the solution "through accident or vandalism.... would probably cause a major fish kill in the South Fork Trinity River and could possibly affect the health of downstream water users."[2] ER at 27. The inspector requested prompt action to prevent such a catastrophe, and advised Robert Jensen that he should either find another operating lumber mill that could use the fungicide, or contact an appropriate hazardous waste removal company.

The Jensens' attorney at the time responded by letter dated February 10, 1984. He advised the California Water Board that JLC would "almost certain[ly]" go completely out of business and that its bankruptcy case likely would be converted to a Chapter 7 proceeding. He also informed the California Water Board that JLC "has no funds available to dispose of the lumber fungicide." ER at 28. On February 13, 1984, the Jensens filed a Chapter 7 personal bankruptcy petition. On March 20, 1984, as predicted, JLC converted its pending corporate Chapter 11 proceedings to a Chapter 7 liquidation.

The California Water Board brought the California DHS in to assist in removing the fungicide on March 23, 1984. On May 18, 1984, a California DHS waste management specialist supervised the removal of the solu-

---

* Ruggero J. Aldisert, Senior Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

1. The JLC mill was located outside of Hyampom, California, a small town situated roughly halfway between Eureka and Redding, California, and almost directly due south of the town of Burnt Ranch, California.

2. PCP is "highly toxic" and can cause liver and kidney damage, adverse changes in respiratory,

circulatory, and renal functions, edema of the brain and lungs, and inflammation of the gastric mucosa. ER at 41. The presence of PCP and other toxins at the abandoned JLC site was particularly serious because Hyampom's 300 residents, residing within a three-mile radius of the mill, utilized well water drawn from a main aquifer as their primary source of drinking water. Contamination of this aquifer would be a significant problem. Id.

tion from the six foot by six foot by twenty foot dip tank. The California DHS specialist noticed spillage inside the building housing the tank, and evidence of leakage on the river side of the building. He took soil samples, which revealed varying concentrations of PCP contamination; the worst contamination seemed to be located, not surprisingly, in and around the dip tank. Initial estimates of the volume of fungicide in the tank had been about 3,000 gallons. In fact (as suggested above), about 5,000 gallons were pumped into the waste removal tanker, filling it to capacity.[3]

The Jensens' personal bankruptcy case was closed on February 20, 1985. No assets were distributed to creditors. The JLC corporate bankruptcy proceedings closed March 18, 1987. On March 30, 1987, California DHS notified Robert Jensen that it considered him a responsible party liable for the cleanup of the hazardous waste at the JLC site. Rosemary Jensen was later named a potentially responsible party.

Eventually, having been unable to persuade the Jensens or other involved parties to undertake independently the cleanup operation, California DHS developed its own remedial action plan. California DHS has spent over $900,000 at the JLC site (including areas other than the dip tank). The Jensens, doing business as JLC, have been allocated ten percent financial responsibility for the cleanup.

On December 5, 1988, the Jensens' personal bankruptcy proceedings were reopened to permit them to list California DHS and the other parties to the JLC site cleanup as creditors. Their adversary proceeding complaint, dated April 24, 1989, sought a determination that their pro rata share of the cleanup expenses had been "discharged by the granting of the discharge to the debtors herein on July 23, 1984." ER at 7–8.

Ruling on cross-motions for summary judgment, the bankruptcy court determined that California DHS's cleanup recovery claim "arose postpetition and is not subject to discharge." *In re Jensen,* 114 B.R. 700, 707 (Bankr.E.D.Cal.1990). The BAP reversed, finding that "[b]ecause ... claims in bankruptcy arise based upon the debtor's conduct, ... [California] DHS's claim arose in this case prepetition, and was therefore discharged in the Jensens' bankruptcy." *In re Jensen,* 127 B.R. 27, 33 (Bankr. 9th Cir.1991). California DHS filed its notice of appeal from that decision on June 3, 1991.

## II. Analysis

■■■ The BAP's decision is reviewed de novo. *In re Dewalt,* 961 F.2d 848, 850 (9th Cir.1992). The bankruptcy court's conclusions of law are reviewed de novo, and its findings of fact are reviewed for clear error. *Id.*

■■■ The intersection of environmental cleanup laws and federal bankruptcy statutes is somewhat messy. The Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C.A. §§ 9601–9675 (1988 & Supp.1993) ("CERCLA"), and similar state laws, like California's Carpenter–Presley–Tanner Hazardous Substance Account Act, Cal.Health & Safety Code §§ 25300–25395 (West 1992) ("HSA"),[4] seek "to protect public health and the environment by facilitating the cleanup of environmental contamination and imposing costs on the parties responsible for the pollution." Kevin J. Saville, Note, *Discharging CERCLA Liability in Bankruptcy: When Does a Claim Arise?,* 76 Minn.L.Rev. 327, 327 (1991)

---

**3.** As a result, "there was no room [in the removal tanker] for any [dip] tank rinseate." ER at 155. The California DHS specialist posted hazardous waste signs at the building entrances. Despite the warnings, a federal Environmental Protection Agency ("EPA") inspection on April 4, 1985 revealed that the free-standing portions of the cinder-block dip tank had been disassembled and set outside the building; "the stained back and left side of the tank remained as part of the building." ER at 39. Incredibly, the EPA officials were told by a man at the site that the dip

tank building "would be leased to him for use as an auto body shop." *Id.*

**4.** We adopt the bankruptcy court's apt observation that "general references to CERCLA cases" are acceptable even in the context of litigation dealing primarily with HSA "in light of the strong similarity and interdependence between the two" statutes. *In re Jensen,* 114 B.R. at 703 n. 4.

[hereinafter *Discharging CERCLA Liability in Bankruptcy* ].

■ By contrast, the Bankruptcy Reform Act of 1978, 11 U.S.C.A. §§ 101–1330 (1988 and Supp.1993), is "designed to give a debtor a 'fresh start' by discharging as many of its 'debts' as possible." Arlene Elgart Mirsky et al., *The Interface Between Bankruptcy and Environmental Laws,* 46 Bus.Law. 626, 626 (1991) [hereinafter *The Interface Between Bankruptcy and Environmental Law* ]. Consistent with this policy, a "claim" is defined at 11 U.S.C.A. § 101(5) in these broad terms:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy. is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C.A. § 101(5).

Conflict and concusion are almost inevitable. *See In re Chicago, M., St. P. & P.R.R.,* 974 F.2d 775, 777 (7th Cir.1992). For instance,

> [i]f a problem exists but has not been found or if a cleanup occurs at an identified site before liability is determined, can one of the potentially responsible parties ("PRPs") get a complete discharge in bankruptcy? [And h]ow can a debtor get a fresh start if it is potentially subject to environmental liability, a large portion of which may be contingent ...?

*The Interface Between Bankruptcy and Environmental Laws,* 46 Bus.Law. at 627.

Notwithstanding what might be perceived to be diametrically opposed philosophies, the Supreme Court has indicated more than once that, if possible, these two conflicting objectives should be reconciled. *Erman v. Lox Equip. Co.,* 142 B.R. 905, 907 (N.D.Cal.1992) (citing, *inter alia, Midlantic Nat'l Bank v. New Jersey Dep't of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986); *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985)); *see also In re Nat'l Gypsum Co.,* 139 B.R. 397, 404 (N.D.Tex.1992) ("it is not a question of which statute should be accorded primacy over the other, but rather what interaction between the two statutes serves most faithfully the policy objectives embodied in the two separate enactments of Congress").

Courts considering when a claim for environmental response costs arose have employed somewhat varying approaches to the question. *See In re Jensen,* 127 B.R. at 30–33. Several courts, including the bankruptcy court below, have rejected the argument that a CERCLA claim arises upon the release or threatened release of hazardous waste, holding instead that each element of a CERCLA claim must be established, including the incurrence of response costs, before a dischargeable claim arises. *United States v. Union Scrap & Metal,* 123 B.R. 831, 838 (D.Minn.1990) (citing *In re Jensen,* 114 B.R. at 706); *cf. In re M. Frenville Co.,* 744 F.2d 332 (3d Cir.1984) (defendant accounting firm in damages action filed by banks had "an unmatured, unliquidated, disputed claim" against debtor for indemnity and contribution when banks filed their action), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985).

The BAP rejected this analysis as inconsistent with the broad statutory definition of a "claim" and with "the overriding goal of the Bankruptcy Code to provide a 'fresh start' for the debtor." *In re Jensen,* 127 B.R. at 31 (quoting *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991)). Indeed, neither *Union Scrap* nor *Frenville* has had a substantial impact. The Minnesota district court, in an opinion subsequent to *Union Scrap,* disregarded the "response costs" rule and focused instead on when the party asserting the CERCLA claim had notice of the claim:

> When the debtor has not disclosed its potential [CERCLA] liabilities in long-since closed bankruptcy proceedings, and the governmental agency has not had actual knowledge of the potential claim in sufficient time to file a claim in those proceed-

ings, the potential [CERCLA] claim is not discharged.

*Sylvester Bros. Dev. Co. v. Burlington N.R.R.*, 133 B.R. 648, 653 (D.Minn.1991).

In a case following its decision in *Frenville*, the Third Circuit considered whether a contingent claim for contribution under CERCLA could arise before CERCLA was enacted. The court held, "[I]t was not until the passage of CERCLA that a legal relationship was created between the [parties] relevant to the petitioners' potential causes of action such that an interest could flow." *In re Penn Cent. Transp. Co.*, 944 F.2d 164, 168 (3d Cir.1991), *cert. denied*, ⸺ U.S. ⸺, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992). The court did not cite *Frenville* but instead relied on *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir.) (claims of plaintiffs asserting tort causes of action under Federal Employers' Liability Act did not arise until plaintiffs suffered identifiable, compensable injuries), *cert. denied*, 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985).

The Seventh Circuit has also considered this issue. In *In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 974 F.2d 775, the state of Washington took soil samples and conducted tests concerning possible contamination at a railyard formerly owned by the debtor in bankruptcy. Shortly before the consummation date, the test results were obtained, indicating that contamination had taken place. The state did not file a proof of claim before the relevant bar date. The court held:

> when a potential CERCLA claimant can tie the bankruptcy debtor to a known release of a hazardous substance which this potential claimant knows will lead to CERCLA response costs, and when this potential claimant has, in fact, conducted tests with regard to this contamination problem, then this potential claimant has, at least, a contingent CERCLA claim for purposes of Section 77.

*Id.* at 786.

A different approach—the one utilized by the BAP in reversing the bankruptcy court's decision in this case—counsels that the bankruptcy claim arises at the time of the debtor's conduct relating to the contamination. *In re Jensen*, 127 B.R. at 32–33. In other words, response costs expended by a California DHS or EPA are dischargeable where they result from pre-petition releases or threatened releases of hazardous substances. *In re Chateaugay Corp.*, 944 F.2d 997, 1005 (2d Cir.1991); *In re Jensen*, 127 B.R. at 33 ("a claim arises for purposes of discharge upon the actual or threatened release of hazardous waste by the debtor").

Another method for addressing the environmental/bankruptcy issue might be called the "relationship" test. *See In re Edge*, 60 B.R. 690 (Bankr.M.D.Tenn.1986). This approach establishes the date of a bankruptcy claim "at the earliest point in the relationship between the debtor and the creditor." *In re Jensen*, 127 B.R. at 31. For example, although a debtor dentist's pre-petition negligence may escape detection until post-petition, a bankruptcy claim arises at the point of the dentist's negligent act. *Id.* at 31–32 (discussing *In re Edge* ). A post-petition suit against the debtor dentist was prohibited by 11 U.S.C. § 362's automatic stay. *In re Edge*, 60 B.R. at 705.

■ Not all of these analyses give adequate consideration to the policy goals of the environmental laws and the bankruptcy code. To hold that a claim for contribution arises only when there is an enforceable right to payment appears to ignore the breadth of the statutory definition of "claim." In relevant part, a claim is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C.A. § 101(5)(A). This "broadest possible definition" of "claim" is designed to ensure that "all legal obligations of the debtor, *no matter how remote or contingent*, will be able to be dealt with in the bankruptcy case." H.R.Rep. No. 595, 95th Cong., 2d Sess. 1, 309 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6266 (emphasis added); S.Rep. No. 598, 95th

Cong., 2d Sess. 1, 22, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5808 (same).[5]

The breadth of the definition of "claim" is critical in effectuating the bankruptcy code's policy of giving the debtor a "fresh start." *The Interface Between Bankruptcy and Environmental Laws*, 46 Bus.Law. at 650. *Frenville*'s "right of payment" theory is "widely criticized" outside the Third Circuit, *id.* at 652, at least in part because it would appear to excise "contingent" and "unmatured" claims from § 101(5)(A)'s list.

The debtor's conduct approach adopted by the BAP in this case is not immune from criticism, either. One commentator has noted that "[d]espite Congress's repeal of the 'provability' requirement and its broad definition of 'claim,' nothing in the legislative history or the Code suggests that Congress intended to discharge a creditor's rights before the creditor knew or should have known that its rights existed." *Discharging CERCLA Liability in Bankruptcy*, 76 Minn.L.Rev. at 348.

Moreover, "discharging liability solely because a release of hazardous substances occurred pre-petition may conflict with CERCLA's goal of cleaning up the environment quickly." *Id.* at 350. This drawback is, in a sense, the flipside of the "right to payment" approach, which ignores important bankruptcy concepts and objectives. Few would doubt that courts should not encourage the frustration of environmental cleanup efforts, just as courts should not override congressional attempts to legislate bankruptcy procedures and goals.

The "relationship" approach, when defined as broadly as in *In re Chateaugay*, "undermine[s] the rationale for considering whether or not a relationship exists," namely "that a creditor with a relationship may anticipate its potential claim." *Id.* at 353. "When courts fail to limit the scope of the relationship to situations where some pre[-]petition interaction between the PRP and the EPA existed, this expansive relationship approach takes on the characteristics of and thus suffers from the same infirmities as the 'underlying acts' approach." *Id.*

The sometimes competing policy goals of environmental law and the bankruptcy code were carefully balanced by Judge Barefoot Sanders in *In re National Gypsum*, 139 B.R. at 409. What might be called the "fair contemplation" test provides that "all future response and natural resource damages cost based on pre-petition conduct that can be fairly contemplated by the parties at the time of [d]ebtors' bankruptcy are claims under the [Bankruptcy] Code." *Id.* This approach stems from the belief that

> [t]he only meaningful distinction that can be made regarding CERCLA claims in bankruptcy is one that distinguishes between costs associated with pre-petition conduct resulting in a release or threat of release that could have been "fairly" contemplated by the parties; and those that could not have been "fairly" contemplated by the parties.

*Id.* at 407–08.

*In re National Gypsum* spells out certain indicia of fair contemplation ("knowledge by the parties of a site in which a PRP may be liable, NPL ['National Priorities List'] listing, notification by EPA of PRP liability, commencement of investigation and cleanup activities, and incurrence of response costs," *id.* at 408), and emphasizes that it is "not meant to encourage or permit dilatory tactics on the part of EPA or any other relevant government agency." *Id.* The Seventh Circuit in *In re Chicago, Milwaukee* follows a kindred analysis. What Judge Sanders described as "fairly contemplated by the parties," the Seventh Circuit described as the contemplation of a potential CERCLA claimant. According to the Seventh Circuit, when a bankruptcy

---

5. The authors of one recent article are direct in their rejection of a "right to payment"-type approach:

> The determination of when a claim arises for purposes of bankruptcy law should be a matter of federal bankruptcy law and should not be governed by the particular state or nonCode federal law giving rise to the claim. The reason for this is that the Code definition of "claim" expressly includes rights to payment or equitable relief that are unmatured or unliquidated. Most state or nonCode federal statutes are only concerned with claims that have matured or been liquidated.

*The Interface Between Bankruptcy and Environmental Laws*, 46 Bus.Law. at 651 (footnotes omitted).

debtor can be tied to a known release of a dangerous substance and when a potential CERCLA claimant has conducted tests revealing a contamination problem, a contingent CERCLA claim arises.

*In re Chateaugay* "relationship" approach adopts "so broad a definition of claim so as to encompass costs that could not 'fairly' have been contemplated by the EPA or the debtor pre-petition." *Id.* at 407. In rejecting that approach, the court in *In re National Gypsum* remarked that

> conduct giving rise to release or threatened release of hazardous substances prepetition should be the relevant inquiry in determining the existence of a claim in bankruptcy, [but] this Court is not willing to favor the Code's objective of a "fresh start" over CERCLA's objective of environmental cleanup to the extent exhibited by *Chateaugay*.... [T]here exists no distinction between debtor's conduct and the release or threatened release resulting from this conduct.

*Id.* (footnotes omitted).

Here, the California Water Board and California DHS are agencies of the same state, involved generally in many of the same capacities. An inspector from the California Water Board visited the inactive lumberyard on January 25, 1984, and observed the fungicide dip tank. The Board notified Robert Jensen of the problem by letter dated February 2, 1984. The letter demonstrates that the Board knew of the serious environmental hazard that existed at the site:

> If this cinder block tank were to be broken through accident or vandalism, the contents of the tank would reach the South Fork Trinity River via a small stream which runs behind the building. The volume of fungicide involved would probably cause a major fish kill in the South Fork Trinity River and could possibly affect the health of downstream water users.

ER at 27. We will impute the California Water Board's knowledge to California DHS. We conclude that the state had sufficient knowledge of the Jensens' potential liability to give rise to a contingent claim for cleanup costs before the Jensens filed their personal bankruptcy petition on February 13, 1984.

The claim filed by California DHS against the Jensens therefore was discharged in the Jensens' bankruptcy.

AFFIRMED.