REYNOLDS BROTHERS, INC. *vs.* TEXACO, INC., & another.[1]

Norfolk. February 6, 1995. - April 14, 1995.

Present: ABRAMS, NOLAN, LYNCH, & GREANEY, JJ.

*Bankruptcy*, Discharge, Claim. *Environment*, Environmental cleanup costs. *Waiver. Practice, Civil*, Waiver. *Words*, "Claim."

Discussion of Federal cases considering the issues of when a cause of action alleging liability for environmental cleanup costs becomes a claim for purposes of the Bankruptcy Code, 11 U.S.C. § 101 (5) (1988). [118-121]

This court adopted the fair contemplation-foreseeability test as set forth in, e.g., *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 974 F.2d 775, 787 (7th Cir. 1992), to determine when a cause of action for environmental cleanup costs under G. L. c. 21E becomes a claim within the meaning of the Bankruptcy Code so as to be dischargeable. [120-121]

In an action for environmental cleanup costs under G. L. c. 21E, the record clearly established that the plaintiff "fairly contemplated" its claim prior to the defendant's bankruptcy proceedings; where the plaintiff failed to have notified the defendant of its claim or to have filed a proof of claim in Bankruptcy Court, the claim had been discharged in the bankruptcy proceeding [121-124] and was not preserved by the terms of the reorganization plan approved by the Bankruptcy Court [124].

A defendant in a civil action timely raised the defense in its answer that the claim had been discharged in bankruptcy. [124-125]

The record of an action brought under G. L. c. 21E for costs of environmental cleanup did not support the plaintiff's contention that its claims were not barred by discharge in the defendant's bankruptcy proceeding by reason of alleged "continuing releases" of contaminants beyond the date of approval of the defendant's reorganization in bankruptcy. [125]

CIVIL ACTION commenced in the Superior Court Department on June 27, 1990.

---

[1]Prevett Oil Co., Inc.

Motions for summary judgment were heard by *Patrick F. Brady*, J., and final judgment was entered by *Thomas E. Connolly*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Evan Slavitt* for the plaintiff.

*Barry A. Bachrach* for Texaco, Inc.

NOLAN, J. The significant issue raised in this appeal is when does a cause of action for environmental cleanup costs under G. L. c. 21E (1992 ed.) constitute a "claim" subject to discharge under the United States Bankruptcy Code. The plaintiff, Reynolds Brothers, Inc. (Reynolds), is the beneficial owner of a parcel of land located at 91-99 Jackson Street in Canton (site). The site had been previously owned or occupied by the defendants, Texaco, Inc. (Texaco), and Prevett Oil Co., Inc. (Prevett). Following the discovery of oil contamination at the site, the plaintiff commenced this action pursuant to G. L. c. 21E, § 5 (*a*) (1) and (5), seeking damages and a declaration of liability for future costs from the defendants whom the plaintiff alleges contributed to the contamination.[2] The plaintiff moved for partial summary judgment on the issue of liability, and the defendants each filed cross motions for summary judgment. The judge denied the plaintiff's and Prevett's motions,[3] but granted Texaco's motion on the basis that the plaintiff's claims were discharged in bankruptcy.[4] The plaintiff filed a timely notice of appeal, and we transferred the case to this court on our own motion. We now affirm.

We begin by setting out the relevant facts. The site at issue has a long history of use as an oil storage facility. In the 1930s, a previous owner, Deane Coal Company, Inc. (Deane Coal), installed four oil storage tanks on the site. During the

---

[2]The plaintiff also asserted claims of negligence, nuisance, and trespass.

[3]The denial of the plaintiff's motion is not the subject of this appeal.

[4]The judge also granted Texaco's summary judgment against Prevett on its cross claim for contribution on the same basis. Prevett did not appeal from this ruling.

1940s, Deane Coal merged with Reynolds Brothers Fuel Corporation, which operated the site from 1947 until 1962. In 1962, William P. Reynolds purchased the site and leased it to White Fuel Corporation (White Fuel) for use as a petroleum terminal. White Fuel purchased the property in 1972, and merged into Texaco in 1979. Later that year, Texaco sold the site to Wren Realty Trust, a real estate trust in which the plaintiff holds a beneficial interest. In June, 1980, the plaintiff leased the site to Prevett for use as an oil terminal.

In August, 1982, the Canton board of health discovered oil contamination in a drainage ditch located near the site. On November 9, 1982, after investigations by the Canton board of health and the Department of Environmental Quality Engineering (DEQE),[5] the DEQE issued a Notice of Responsibility to the plaintiff regarding the oil contamination at the site. In that notice, the DEQE ordered the plaintiff, among other things, to (1) engage a licensed contractor to clean the site; (2) remove all oil, contaminated soil and materials in the drainage ditch, impoundment area, and drainage system; and (3) remove all free floating oil and contaminated trap rock beneath the fuel oil storage tanks. Despite the clear directives of the DEQE, the plaintiff refused to comply. In January, 1983, the DEQE cited the plaintiff for noncompliance with cleanup and containment requirements.[6]

In 1985, the plaintiff retained Gale Engineering Company (Gale) to evaluate the site. Following its investigation, Gale recommended that the plaintiff either remove and dispose of all contaminated soils, or contain the area. Gale also noted in its report that soil contamination had increased significantly since 1982, and attributed this condition to the site's "contin-

---

[5]The Department of Environmental Quality Engineering (DEQE) is the predecessor agency of the present Department of Environmental Protection (DEP).

[6]During 1982 to 1984, health authorities from the Canton board of health advised the plaintiff and its lessee, Prevett, of the need to clean the contaminated site.

ued neglect and lack of adequate diking beneath [the] storage tanks."

In June, 1987, the plaintiff retained Costello Dismantling Company to clean, remove, and dispose of two of the site's oil tanks. Approximately one year later, the remaining two tanks were removed. According to the plaintiff, between September and November, 1988, it removed 440 tons of contaminated soil, incurring over $94,500 in cleanup costs. In addition, the plaintiff alleges that it will continue to incur significant response costs in connection with the remediation of the contaminated site.

On April 12, 1987, Texaco filed a Chapter 11 petition for bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York. The court set a March 15, 1988, deadline for the filing of claims against Texaco (bar date). Texaco notified potential claimants of this bar date by publication in the Wall Street Journal and New York Times newspapers. On March 23, 1988, the Bankruptcy Court confirmed Texaco's plan of reorganization, and discharged all prepetition claims.[7] Neither the plaintiff nor Prevett filed a proof of claim in accordance with the Bankruptcy Court's bar order. Despite the plaintiff's knowledge of the site's oil contamination as early as August, 1982, the plaintiff failed to notify Texaco of its potential liability until October 17, 1988.

1. *"Claims" under the Bankruptcy Code.* The plaintiff argues that its cause of action for environmental cleanup costs under c. 21E did not constitute a "claim" within the meaning of the Bankruptcy Code at the time of Texaco's bankruptcy proceedings. The Bankruptcy Code broadly defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101 (5) (1988). Under Chapter 11 of the Bankruptcy Code, a debtor filing for reor-

---

[7] Prepetition claims are those claims which arose prior to April 12, 1987, the date Texaco filed its petition for bankruptcy protection.

ganization must submit a plan for reorganization to the Bankruptcy Court. Upon creditor approval and court confirmation of the plan, all prepetition debts not provided for in the plan will be discharged. See 11 U.S.C. § 1126 (a) - (g), § 1123 (a) (4), § 1141 (1988). A creditor who has a "claim" must file a proof of the claim with the Bankruptcy Court prior to the date fixed by the court, else the claim will be discharged upon judicial confirmation of the reorganization plan.

Although we have not before been faced with the issue of when a c. 21E cause of action constitutes a "claim" under the Bankruptcy Code, other courts have confronted a similar issue involving claims under CERCLA,[8] the parallel Federal statute. In cases involving CERCLA, courts have applied various standards in order to determine when environmental liability arising from the debtor's prepetition conduct becomes a claim for bankruptcy purposes. See Note, When Policies Collide: The Conflict Between the Bankruptcy Code and CERCLA, 24 Mem. St. U.L. Rev. 739, 762 (1994). At least three approaches have been used to determine when such a claim arises: (1) the claim arises upon the establishment of a certain relationship between the debtor and the creditor (relationship test), see *In re Chateaugay Corp.*, 944 F.2d 997, 1005 (2d Cir. 1991); (2) the claim arises at the time the claim could have been fairly contemplated or was reasonably foreseeable by the creditor (fair contemplation-foreseeability test), see *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 974 F.2d 775, 787 (7th Cir. 1992); *In re Nat'l Gypsum Co.*, 139 B.R. 397, 409 (Bankr. N.D. Tex. 1992); (3) the claim arises when the creditor actually incurs the response costs (right to payment approach), see *United States* v. *Union Scrap Iron & Metal*, 123 B.R. 831, 838-839 (Bankr. D. Minn. 1990).

---

[8]CERCLA refers to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601-9675 (1988 & Supp. 1990).

We prefer the fair contemplation-foreseeability approach as the means to determine when a cause of action under c. 21E becomes a claim for purposes of the Bankruptcy Code. Several courts throughout the country have adopted this approach, see, e.g., *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 3 F.3d 200, 205 (7th Cir. 1993); *In re Jensen*, 995 F.2d 925, 930-931 (9th Cir. 1993); *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 974 F.2d at 787; *In re Nat'l Gypsum Co., supra*; *AM Int'l, Inc.* v. *Datacard Corp.*, 146 B.R. 391, 393-394 (Bankr. N.D. Ill. 1992); *NCL Corp.* v. *Lone Star Bldg. Ctrs. (E.) Inc.*, 144 B.R. 170, 177 (Bankr. S.D. Fla. 1992), and at least one court in this circuit has expressed its approval. See, e.g., *Mesiti* v. *Microdot, Inc.*, 156 B.R. 113, 117 (Bankr. D.N.H. 1993) ("The preferred means of [deciding whether postbankruptcy CERCLA claims are discharged] involves judicial application of a 'foreseeability' test"). See also Note, Discharging CERCLA Liability in Bankruptcy: When Does a Claim Arise?, 76 Minn. L. Rev. 327 (1991) (advocating for the adoption of a foreseeability standard to determine when CERCLA claims are dischargeable in bankruptcy).

The "fair contemplation" test provides that "all future response and natural resource damages cost based on prepetition conduct that can be fairly contemplated by the parties at the time of [d]ebtors' bankruptcy are claims under the [Bankruptcy] Code." *In re Jensen, supra* at 930, quoting *In re Nat'l Gypsum Co., supra* at 409. Factors relevant to whether the claims are fairly contemplated include: "knowledge by the parties of a site in which a PRP [potentially responsible party] may be liable, NPL [National Priorities List] listing, notification by EPA [the Environmental Protection Agency] of PRP liability, commencement of investigation and cleanup activities, and incurrence of response costs." *In re Nat'l Gypsum Co., supra* at 408.

The United States Court of Appeals for the Seventh Circuit employed a similar approach in *In re Chicago, Milwaukee, St. Paul & Pac. R.R., supra* at 787. In that case, the United States Court of Appeals for the Seventh Circuit an-

nounced a possible formulation of when a contingent claim for recovery of environmental cleanup costs arises: "[W]hen a potential CERCLA claimant can tie the bankruptcy debtor to a known release of a hazardous substance which this potential claimant knows will lead to CERCLA response costs, and when this potential claimant has, in fact, conducted tests with regard to this contamination problem, then this potential claimant has, at least, a contingent CERCLA claim." *Id.* at 786.

The record clearly establishes that the plaintiff "fairly contemplated" its claim under c. 21E prior to Texaco's bankruptcy proceedings. Texaco filed for bankruptcy protection in April, 1987. The plaintiff, however, was aware of Texaco's potential liability for the environmental cleanup of the oil tank facility long before that date. As early as November 9, 1982, the DEQE issued a Notice of Responsibility to the plaintiff regarding the oil contamination at the site. On January 19, 1983, the DEQE cited the plaintiff for noncompliance with cleanup and containment requirements. During 1982 through 1984, the Canton board of health repeatedly informed the plaintiff and its lessee, Prevett, of the need to clean the contaminated site. In 1985, the plaintiff retained an engineering firm which confirmed the soil contamination and identified the oil storage tanks as the source of contamination. In its report to the plaintiff, the engineering firm recommended either removal and disposal of the contaminated soil, or containment of the area. In addition, the report stated that "soil contamination had increased significantly since the initial [DEQE] investigation in August and September 1982."[9] Finally, the plaintiff was aware that Texaco was a previous owner of the site, and had used the site as an oil storage facility. The record, thus, clearly supports Texaco's contention that the plaintiff had sufficient knowledge of Tex-

---

[9]The plaintiff's contention that it did not learn of the extent of its potential liability until after the close of Texaco's bankruptcy proceedings is not supported by the record. In its 1985 report, the engineering firm estimated the cost for removal and proper disposal of all contaminated soils to be between $150,000 and $200,000.

aco's potential liability to give rise to a contingent claim dischargeable in bankruptcy.[10] See *In re Jensen, supra* at 930-931 (State had sufficient knowledge of debtor's potential liability to give rise to a contingent claim for cleanup costs before debtor filed bankruptcy petition).

To support its argument that its c. 21E claim is not a "claim" for purposes of bankruptcy, the plaintiff relies on the right to payment approach adopted in *United States* v. *Union Scrap Iron & Metal*, 123 B.R. 831 (Bankr. D. Minn. 1990). In *Union Scrap*, the Environmental Protection Agency (EPA) sought to recover CERCLA response costs from Taracorp Industries, Inc. (Taracorp). *Id.* at 832. Taracorp moved to dismiss the suit claiming that its Chapter 11 reorganization barred the EPA's claims. *Id.* Taracorp argued that the release or threatened release of any hazardous substance which occurred prior to the filing of its bankruptcy petition was sufficient to create a legal obligation constituting a claim in bankruptcy. *Id.* at 835-836. The court rejected this approach, holding instead that the EPA did not have a CERCLA claim for purposes of bankruptcy until it actually incurred the response costs. *Id.* at 838. The court based its decision, not only on the fact that the EPA had not yet incurred response costs, but also on the fact that the EPA had no actual or presumed knowledge that Taracorp had any connection with the contaminated site until four years after the close of Taracorp's bankruptcy.[11] *Id.* at 836.

---

[10]The plaintiff also argues that its claim did not arise until 1988 or 1989 when the DEP imposed obligations on the plaintiff to clean the site. The record clearly establishes that the DEQE, DEP's predecessor, imposed obligations on the plaintiff as early as 1982. Further, G. L. c. 21E, § 4 (1992 ed.), provides a private right of action in favor of any person who undertakes the removal of oil or hazardous materials, and who seeks to recover its response costs from the person liable for the contamination. *Griffith* v. *New England Tel. & Tel. Co.*, 414 Mass. 824, 826 (1993). This private right of action exists regardless of any DEP involvement.

[11]Taracorp did not own the hazardous site at issue in *United States* v. *Union Scrap Iron & Metal*, 123 B.R. 831, 833 (Bankr. D. Minn. 1990). Rather Union Scrap owned the site, and processed used batteries for Taracorp.

*Union Scrap* is readily distinguishable from the present case because, unlike the EPA in *Union Scrap*, the plaintiff in this case had actual knowledge of its potential claims against Texaco long before Texaco filed its bankruptcy petition. We further note that the so-called "right to payment" approach set out in *Union Scrap* has been widely criticized as being inconsistent with the broad statutory definition of "claim," and with the overriding goal of the Bankruptcy Code to provide a "fresh start" for the debtor. See *In re Jensen, supra* at 928. It has also been criticized as encouraging creditors to delay cleanup efforts until the close of bankruptcy proceedings. *In re Chicago, Milwaukee, St. Paul & Pac. R.R., supra* at 786 ("such stall tactics [may] not only frustrate the [B]ankruptcy [C]ourt's interest in having all claims before it and the debtor's interest in a fresh start, but [also] frustrate CERCLA's interest in a speedy cleanup of hazardous sites"). In addition, the significance of this opinion is questionable in light of a subsequent opinion in which the United States District Court for the District of Minnesota shifted its focus from whether the creditor incurred response costs to whether the creditor knew of its claim prior to the close of the bankruptcy proceedings. See *Sylvester Bros. Dev. Co.* v. *Burlington N.R.R.*, 133 B.R. 648, 653 (Bankr. D. Minn. 1991) (where governmental agency had no actual knowledge of potential CERCLA claim prior to the close of debtor's bankruptcy proceedings, claim is not discharged). Because *Union Scrap* has no application in this case, we decline to follow it.[12]

---

[12]The relationship test set out *In re Chateaugay Corp.*, 944 F.2d 997, 1005 (2d Cir. 1991), and relied on by the motion judge below, also compels the conclusion that the plaintiff had a claim dischargeable in bankruptcy. Under this approach, unincurred response costs are "claims" dischargeable in bankruptcy, so long as a release or threatened release of hazardous wastes occurs prepetition, and the relationship between the parties provides sufficient contemplation" of the "ultimately maturing payment obligations." *Id.* The *Chateaugay* court found that the regulatory relationship between the debtor and the EPA was sufficient to bring into contemplation the nature of response costs that would be incurred, and to

2. *Claims preserved under Texaco's reorganization plan.* The plaintiff next argues that its environmental claims were preserved under Texaco's reorganization plan because its claims are derivative of the claims of a governmental entity. We disagree. Texaco's reorganization plan exempted environmental claims of governmental entities from Texaco's bankruptcy protection.[13] The plan did not, however, similarly preserve environmental claims of private parties. Thus, under the plain terms of the reorganization plan, the plaintiff's claims are not preserved.

3. *Waiver.* We further reject the plaintiff's argument that Texaco waived the affirmative defense of discharge in bankruptcy by failing to include this defense in its original answer. The plaintiff initially named Texaco Overseas Holdings, Inc., as defendant in this case. After discovering that the plaintiff sued the wrong party, the parties agreed to substitute Texaco, Inc., as the proper defendant, and entered into a stipulation of substitution which anticipated the possibility that Texaco would raise additional affirmative de-

---

warrant discharging claims based on prepetition releases. *Id.*

Under the relationship test, the plaintiff clearly had a "claim" dischargeable in bankruptcy. Texaco and its predecessor, White Fuel, owned or operated the site from 1962 to 1979. Texaco did not file for bankruptcy until April, 1987. Thus, any contamination attributable to Texaco occurred prepetition. Further, like the regulatory agency relationship in *Chateaugay*, the relationship between the plaintiff and Texaco was such that the plaintiff was aware of Texaco's potential liability prior to the bankruptcy proceedings. The plaintiff knew of the contamination at the site, knew that Texaco had been a previous owner, and knew that Texaco had used the site as an oil storage facility.

[13]The reorganization plan provided: "The Claims of the [Department of Energy] and any Environmental Claims that are not Allowed Claims will not be discharged, will survive the Reorganization Cases, will be resolved in the judicial or administrative tribunals in which such Claims would have been determined as if the Reorganization Cases had not been commenced, and the amount of such Claims and the respective holder's rights related thereto will be determined as if the Reorganization Cases had not been commenced, whether or not a proof of claim in respect thereto is filed." The plan defined "Environmental Claims" as "any Claims which have been or may be asserted by any governmental unit arising under various federal or similar statutes regarding environmental protection and related legislation, rules and regulations."

fenses. The stipulation provided: "To the extent that Texaco, Inc. wishes to amend its answer . . . Texaco, Inc. shall have twenty (20) days to file such amendment." In accordance with the stipulation, Texaco amended its answer in a timely fashion, and included the affirmative defense of discharge in bankruptcy.[14]

4. *Continuing releases.* The plaintiff further contends that Texaco's reorganization plan does not bar its claims because there are continuing releases[15] for which Texaco is responsible. The plaintiff has pointed to no evidence in the record, and we have not found any, to support its contention that continuing releases attributable to Texaco have occurred postpetition. We further note that if the plaintiff had responded in a timely manner to the DEP's cleanup directives, further contamination of the premises would have been avoided. The plaintiff should not be able to delay its cleanup efforts in order to preserve its claims against debtors seeking bankruptcy protection.[16]

Accordingly, we affirm the summary judgment.[17]

*So ordered.*

---

[14]The plaintiff's argument that Texaco is estopped from raising the defense of discharge in bankruptcy because of its conduct throughout the litigation is also without merit.

[15]General Laws c. 21E, § 2 (1992 ed.), defines a "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment . . . ."

[16]The plaintiff argues for the first time on appeal that its claims could not have been discharged because it did not receive proper notice of Texaco's bankruptcy proceedings. Since there is no evidence in the record that the plaintiff raised this argument below, we do not reach this issue. See *Commissioner of Correction* v. *McCabe*, 410 Mass. 847, 850 n.7 (1991); *Edgar* v. *Edgar*, 406 Mass. 628, 629 (1990); *Petition for Revocation of a Judgment for Adoption of a Minor*, 393 Mass. 556, 563 n.12 (1984).

[17]Because we affirm the summary judgment, we need not address Texaco's arguments relating to the indemnification agreement and laches.