**SIGNATURE COMBS, INC.,**
**et al., Plaintiffs,**

v.

**UNITED STATES of America,**
**et al., Defendants.**

Nos. 98–CV–2777 D, 98–CV–2968 D, 00–CV–2245 D.

United States District Court,
W.D. Tennessee,
Western Division.

March 19, 2003.

William E. Norcross, Esq., Norcross Law Firm, Cordova, TN, W. C. Blanton, Thaddeus R. Lightfoot, Oppenheimer, Wolff & Donnelly, Minneapolis, MN, David Wade, Esq., Martin, Tate, Morrow & Marston, Memphis, TN, Charlotte Knight Griffin, Memphis, Light, Gas & Water, Memphis, TN, Gary P. Gengel, Morgan, Lewis & Bockius, Princeton, NJ, Nicholas E. Bragorgos, Esq., Mcnabb, Bragorgos & Burgess, PLLC, Memphis, TN, for plaintiffs.

Veronica F. Coleman, Sidney P. Alexander, U.S. Attorney's Office, Memphis, TN, Naikang Tsao, Michele L. Walter, U.S. Department of Justice, Washington, DC, Anne Foster, U.S. Environmental Protection Agency, Dallas, TX, Michael R. Dillon, Morgan, Lewis & Bockius, Philadelphia, PA, Henry T.V. Miller, McDonald Kuhn, Edward B. Ruff, III, Memphis, TN, Edmund W. Chapman, Mobil Business Resources Corporation, Kindra L. Gromelski, Exxon Mobil Law Department, Fairfax, VA, S. Walton Maurras, Smith, Maurras, Cohen, Redd & Horan PLC, Fort Smith, AR, Michael F. Rafferty, Harris, Shelton, Dunlap, Cobb & Ryder, Memphis, TN, for defendants.

Diane Vescovo, Office of Magistrate Judge, Memphis, TN, pro se.

### ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

DONALD, District Judge.

This matter is before the Court on Defendant Mason and Dixon Lines, Inc. ("MDL")'s motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), on Plaintiffs Signature Combs, Inc., et al. ("Plaintiffs")' Third Amended Complaint ("Complaint") seeking cost recovery under 42 U.S.C. §§ 9607(a)(3) and 96013(f)(1). MDL's Mot. For J. On The Pleadings, Doc. # 217–1, Case # 98–cv–02777. MDL contends that Plaintiffs' claims against it were discharged pursuant to MDL's Chapter 11 bankruptcy reorganization. This Court has jurisdiction over Plaintiffs' CERCLA claims pursuant to 28 U.S.C. § 1331. For the following reasons, this Court DENIES MDL's motion for judgment on the pleadings.

### I. *Background Facts and Procedural History*

Pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, Plaintiffs seek to recover response costs allegedly incurred by Plaintiffs at the South 8th Street Landfill Superfund Site and the Gurley Pit Superfund Sites (collectively, the "Gurley Sites"). These response costs stem from remedial measures taken to alleviate hazardous waste dumped at the Gurley Sites in the 1950s–1970s.[1]

On September 8, 1998, the United States filed *United States v. Aircraft Serv. Int'l, Inc., et al.*, No. J–C–98–362 (E.D.Ark.), seeking to recover from Plaintiffs in the instant case $10 million in response costs that the EPA allegedly incurred in implementing the Gurley Pit Site remedy. On September 9, 1998, the Arkansas Department of Pollution Control and Ecology ("ADPC & E") filed *Arkansas Dept. of Pollution Control and Ecology v. Aircraft*

---

1. The relevant facts and background information for the above-titled consolidated cases can be found in this Court's Order Granting Def.'s Mot. To Dismiss ("February 14, 2003 Order"). In the interest of brevity, these facts will not be recited herein.

*Serv. Int'l., Inc., et al.,* No. J–C–98–363 (E.D.Ark.), a virtually identical cost recovery action against Plaintiffs, to recover at least $600,000 in ADPC & E response costs incurred in connection with the Gurley Pit Site. On November 18, 1998, the EPA issued Plaintiffs in the case *sub judice,* along with certain additional parties, a unilateral administrative order ("UAO") pursuant to Section 106 of CERCLA, 42 U.S.C. § 9606, requiring the recipients to perform a specific remedial action for the South 8th Street Site.

On September 8, 1998, Plaintiffs brought the instant suit in an effort to recoup their anticipated expenses from Defendants. Plaintiffs filed their Third Amended Complaint on March 20, 2000. Count II, the only remaining claim in the Complaint,[2] asserts that Defendants are severally liable for contribution to Plaintiffs' past and future cleanup costs under CERCLA Section 113(f)(1), 42 U.S.C. § 96013(f)(1).

On December 19, 2000, Plaintiffs in the instant action entered into a Consent Decree with the United States and the ADPC & E regarding response costs for the Gurley Pit Site and remedial responsibilities for the South 8th Street Site. Without admitting liability, Plaintiffs agreed to conduct and pay for the South 8th Street Site cleanup and to reimburse the United States and the ADPC & E for their expenses incurred in cleaning the Gurley Pit Site.

On January 12, 2001, this Court entered a Case Management Order ("CMO") (Doc. # 149–1, Case # 98–cv–02777) to administer the disposition of the above-titled cases. MDL brought its motion for judgment on the pleadings on February 13, 2002. Plaintiffs filed their opposition brief on March 1, 2002, and MDL filed its reply brief on March 15, 2002.

## II. *Plaintiffs' Procedural Objections To MDL's Motion*

 Plaintiffs claim that MDL's motion is technically improper because it was filed on February 13, 2002, prior to the filing of MDL's answer on May 6, 2002. A motion for judgment on the pleadings may only be brought after the pleadings are closed. Fed.R.Civ.P. 12(c). Pleadings are deemed "closed" upon the filing of a complaint and answer, unless a counterclaim, cross-claim, or third-party claim is interposed, in which case the filing of a reply, cross-claim, or third-party answer will mark the close of the pleadings. *See* Fed.R.Civ.P. 7(a); 5A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1367 (2d ed.1990). Thus, MDL's motion was premature when filed. Nevertheless, MDL subsequently filed an answer on May 6, 2002. Although the Court has the discretion to deny MDL's motion without prejudice in order to allow MDL to re-file its motion on a date subsequent to May 6, 2002, no useful purpose would be served by doing so. Accordingly, the Court will construe MDL's motion as a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Such a motion applies the same analysis as a motion for judgment on the pleadings but is permissible prior to the filing of a defendant's answer.

Similar reasoning applies to Plaintiffs' contention that MDL's motion should be denied because it was filed in violation of the CMO governing the above-titled cases. Section II(2) of the CMO states that "Defendants shall not file responsive pleadings directed to Plaintiffs' amended complaint herein. Nor shall Defendants file any motions under Fed.R.Civ.P. 12 directed to Plaintiffs' amended complaint." In an Order filed April 15, 2002 (Doc. # 250–1,

---

**2.** Count I of the Complaint was dismissed with prejudice against all Defendants in the

above-titled actions by this Court's February 14, 2003 Order.

Case # 98–cv–02777), the Magistrate Judge relaxed Section II(2) of the CMO to allow Defendants to file responsive pleadings, and, ostensibly, certain motions. Thus, had MDL filed its motion after the Magistrate Judge's Order, the motion would not have violated the CMO. Indeed, Rule 12 motions have been filed in the above-titled actions by various Defendants-without objection by the Plaintiffs-since the Magistrate Judge's Order. In the interest of judicial economy, therefore, the Court will address the merits of MDL's motion without directing MDL to re-file it.

### III. *Analysis of MDL's Substantive Claim*

#### A. Motion to Dismiss Standard

A party may move to dismiss a complaint for failure to state a claim upon which relief may be granted under F.R.C.P. 12(b)(6). The purpose of a motion to dismiss under F.R.C.P. 12(b)(6) is to test the formal sufficiency of the claim, not to resolve the facts or merits of the case. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A claim should not be dismissed pursuant to F.R.C.P. 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Thus, the standard to be applied when evaluating a motion to dismiss for failure to state a claim is very liberal in favor of the party opposing the motion. *Westlake v. Lucas*, 537 F.2d 857, 858 (6th Cir.1976). Even if the plaintiff's chances of success are remote or unlikely, a motion to dismiss should be denied. *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683.

In reviewing the complaint, the court must accept as true all factual allegations in the complaint and construe them in the light most favorable to the plaintiff. *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683; *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir.1983), *cert. denied*, 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984). Legal conclusions or unwarranted factual inferences, however, should not be accepted as true. *Lewis v. ACB Business Servs., Inc.*, 135 F.3d 389, 405–06 (6th Cir.1998).

#### B. Determining the Proper Legal Standard for Discharging CERCLA Liability Through Bankruptcy

##### 1. *CERCLA § 113 Contribution Liability Depends On MDL's Liability to the United States*

MDL contends that any CERCLA § 113(f) liability it may have had to Plaintiffs was discharged by MDL's bankruptcy, which became final in 1986. Although this action was filed in 1998, MDL claims that Plaintiffs' claims were discharged because "Mason and Dixon's liability to Plaintiffs depends on whether Mason and Dixon is potentially liable to the United States," and Mason and Dixon's potential liability to the United States itself was discharged by MDL's bankruptcy. Mem. In Supp. of Def.'s Mot. For J. On The Pleadings at 3–4 (Doc. # 218–1, Case # 98–cv–02777).

In response, Plaintiffs argue that their claims are not solely derivative of the United States' claims but are independent statutory claims "which clearly arose after defendant's bankruptcy in the mid–1980s." Mem. In Support of Pls.' Opp. To Def.'s Mot. For J. On The Pleadings at 4 (Doc. # 227–1, Case # 98–cv–02777).

MDL counters by stating that Plaintiffs can only sue for contribution under § 113 of CERCLA. As a result, according to *In re Reading Co.*, 115 F.3d 1111, 44 ERC 1865 (3rd Cir.1997), Plaintiffs' claims must be derivative of those of the United States. Reply Of Def. In Supp. Of Mot. For J. On The Pleadings at 3–4 (Doc. # 234–1, Case # 98–cv–02777) (citation omitted).

In *In re Reading Co.*, the Third Circuit addressed whether the plaintiff's § 113(f) contribution claim against defendant Reading was discharged by Reading's bankruptcy. After reviewing traditional concepts of contribution as well as the statutory text of § 113(f), the court held that § 113(f) "does not permit contribution among liable parties who do not have a common derivation of liability." *In re Reading Co.*, 115 F.3d at 1123. Thus, the court concluded, for the defendant to be liable to the plaintiff for contribution, the defendant must also be liable to the United States under § 107(a). *Id.*

■ Whether § 113(f) permits contribution among parties who do not have a common derivation of liability constitutes an issue of first impression within this Circuit. The Court finds the analysis set forth in *In re Reading Co.* to be persuasive, *see id.* at 1123–24, and accordingly adopts the Third Circuit's holding that a plaintiff may only bring a CERCLA § 113(f) contribution claim against a defendant when both the plaintiff and the defendant share a common derivation of liability. Therefore, Plaintiffs in the case *sub judice* may only bring their CERCLA § 113(f) contribution claims against MDL if both Plaintiffs' and MDL's liability are derivative of the claims of the United States.

2. *When A Contingent CERCLA Claim Arises for the Purpose of Discharging Liability Through Bankruptcy*

■ The next question the Court must answer is whether MDL's potential liability to the United States was discharged by MDL's 1986 bankruptcy. The Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549 (codified as amended at 11 U.S.C. §§ 101–1330 (1988)) (hereinafter "Bankruptcy Code") provides individuals and corporations with a means to obtain relief from their indebtedness. Under Chapter 11 of the Bankruptcy Code, a debtor filing for reorganization proposes a plan for reorganization to the bankruptcy court, 11 U.S.C. § 1121(b) (1988), which the debtor's creditors must approve. 11 U.S.C. § 1126(a)-(g) (1988). The bankruptcy court then must confirm the reorganization plan after determining that the plan provides equal treatment for creditors in the same class, 11 U.S.C. § 1123(a)(4) (1988), and that the proposed plan is feasible, 11 U.S.C. § 1129(a)(11). Once the bankruptcy court completes confirmation of the reorganization plan, "except for the prebankruptcy obligations reaffirmed in the debtor's reorganization plan, the Chapter 11 debtor is 'discharged' from all 'claims' that arose before the bankruptcy confirmation." Kevin J. Saville, *Discharging CERCLA Liability in Bankruptcy: When Does a Claim Arise?*, 76 Minn. L.Rev. 327, 337 (Dec.1991) (citing 11 U.S.C. § 1141 (1988)). The Code defines "claim" as, *inter alia*, a:

right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

11 U.S.C. § 101(5)(A). The debtor remains fully liable for all "claims" arising after the bankruptcy confirmation. *See* Saville, *supra*, at 337. A creditor who has a "claim" must file a proof of the claim with the bankruptcy court prior to a date fixed by the court to avoid the claim being discharged upon judicial confirmation of the reorganization plan. *See* 11 U.S.C. §§ 501 and 502.

MDL contends that any CERCLA liability was discharged by its bankruptcy "because all the necessary elements of a CERCLA claim existed when the plan was confirmed in 1986 and the United States had actual and constructive knowledge

that the claim existed prior to that time." Mem. In Supp. of Def.'s Mot. For J. On The Pleadings at 3–4 (citing *In re Reading Co.*, 115 F.3d at 1111; *Jensen v. California Dept. of Health Servs. (In re Jensen)*, 127 B.R. 27, 33 ERC 1597 (9th Cir. BAP 1991)). Plaintiffs argue that MDL's CERCLA liability was not discharged by its 1986 bankruptcy reorganization because Plaintiffs' claims against MDL were not within the actual or presumed contemplation of the Plaintiffs or the United States. *See* Mem. In Supp. of Pls.' Opp. To Def.'s Mot. For J. On The Pleadings at 5 (citing *United States v. Union Scrap Iron & Metal,* 123 B.R. 831, 836–38 (D.Minn.1990)). Plaintiffs further allege that "full discovery must be completed before facts can determine whether the order which defendant invokes is applicable … and whether the order does or does not shield defendant from plaintiffs' CERCLA claims." *Id.* at 6. MDL responds by claiming that *In re Reading Co.*, rather than *Union Scrap*, is dispositive with regard to when Plaintiffs' claims arose and when those claims were discharged. *See* Reply Of Def. In Supp. Of Mot. For J. On The Pleadings at 2 (citing *In re Jensen*, 127 B.R. 27; *California Dept. of Health Services v. Jensen*, 995 F.2d 925, 36 ERC 1954 (9th Cir.1993) ("*Jensen*")).

This question of when a party's contingent CERCLA liability may be discharged through bankruptcy constitutes an issue of first impression within this Circuit. Courts in other Circuits have split on this issue, adopting different standards for determining when contingent CERCLA claims "arise" for the purpose of bankruptcy discharge. Before adopting an approach, the Court will briefly outline the

varying approaches other courts have taken.

### a. *Right to Payment Approach*

At one end of the jurisprudential spectrum, some courts have held that a claim does not arise until all four CERCLA elements exist.[3] *See In re Reading Co.*, 115 F.3d at 1125; *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 941–44 (3d Cir.), *cert. denied,* 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985); *In re Frenville Co.*, 744 F.2d 332 (3d Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985); *Union Scrap*, 123 B.R. at 835; *In re Federal Press Co.*, 117 B.R. 942, 947 (Bankr.N.D.Ind.1989). Under this approach, known as the "right to payment" approach, a debtor's CERCLA liability will be discharged only if all four CERCLA elements exist prior to bankruptcy. This approach therefore focuses on substantive, non-bankruptcy law to determine when a claim arises.

The right to payment approach has been criticized for failing to address bankruptcy law and policy. One of the chief goals of bankruptcy is providing "a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (citation omitted). The right to payment standard undermines the fresh start policy because the debtor cannot receive a fresh start from its CERCLA liabilities stemming from prebankruptcy conduct if any of the four ele-

---

**3.** These four elements are: 1) the defendant falls within one of the four categories of responsible parties; 2) hazardous substances are disposed at a facility; 3) there is a release or threatened release of hazardous substances from the facility into the environment; and 4) the release causes the incurrence of response costs including removal activities and enforcement activities related thereto. *See In re Reading Co.,* 115 F.3d at 1118, 1125.

ments (some of which are not in the debtor's control) have not been met. *See In re Jensen,* 127 B.R. at 31 (citation omitted); *see also Reynolds Bros., Inc. v. Texaco, Inc.,* 420 Mass. 115, 647 N.E.2d 1205, 1209 (1995); Saville, *supra,* at 348.

Moreover, as set forth above, the Bankruptcy Code defines "claim" more broadly than the traditional cause of action, encompassing any right to payment, no matter how distant or contingent. 11 U.S.C. § 1011(5)(A). Therefore, critics of the right to payment approach argue, non-bankruptcy law such as CERCLA should not control when a bankruptcy claim arises. *See Jensen,* 995 F.2d at 929–30 ("To hold that a claim for contribution arises only when there is an enforceable right to payment appears to ignore the breadth of the statutory definition of 'claim'.... The breadth of the definition of 'claim' is critical in effectuating the bankruptcy code's policy of giving the debtor a 'fresh start.'") (citations omitted); *In re Jensen,* 127 B.R. at 31 ("Such an interpretation simply is unwarranted from a reading of § 101(4), which includes contingent and unmatured rights to payment, as well as those having been reduced to judgments.") (emphasis omitted); *Reynolds Bros.,* 647 N.E.2d at 1209; Saville, *supra,* at 346.

Requiring courts to determine when a bankruptcy claim arises based on whether all four CERCLA elements have been satisfied in effect reinserts a "provability" requirement which was expressly repealed under the 1978 Bankruptcy Code. *See, e.g.,* H.R.Rep. No. 95–595, at *180 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6141, 1977 WL 9628 ("H.R. 8200 abolishes the concept of provability in bankruptcy cases. All claims against the debtor, whether or not contingent or unliquidated will be dealt with in the bankruptcy case...."); *In re Johns–Manville Corp.,* 57 B.R. 680, 690 (Bankr.S.D.N.Y.1986) ("Adherence to [this

approach] would reinstitute the provability concept of claims, which the drafters of the Code specifically intended to abolish"); Saville, *supra,* at 345.

Finally, by giving the creditor so much control over the accrual of its claim, the right to payment standard might encourage nefarious creditors to delay cleaning up sites-and thereby incurring response costs-until the close of bankruptcy proceedings. *See In re Jensen,* 127 B.R. at 31; *Reynolds Bros.,* 647 N.E.2d at 1209. By encouraging such stall tactics, the right to payment approach "not only frustrate[s] the bankruptcy court's interest in having all claims before it and the debtor's interest in a fresh start, but it [also frustrates] CERCLA's interest in a speedy cleanup of hazardous sites." *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 974 F.2d 775, 786 (7th Cir.1992).

### b. *Underlying Act Approach*

At the other end of the spectrum, some courts have maintained that a pre-bankruptcy "claim" subject to the Code's discharge provisions exists so long as the underlying polluting act occurred prior to the debtor's bankruptcy. *See In re Jensen,* 127 B.R. at 32–33; *see also Burlington N.R.R. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.),* 853 F.2d 700, 709 (9th Cir.1988); *Grady v. A.H. Robins Co.,* 839 F.2d 198, 203 (4th Cir.), *cert. dismissed sub nom. Joynes v. A.H. Robins Co.,* 487 U.S. 1260, 109 S.Ct. 201, 101 L.Ed.2d 972 (1988); *Lovett v. Honeywell, Inc. (In re Transportation Sys. Int'l, Inc.),* 110 B.R. 888, 894 (D.Minn.1990), *aff'd,* 930 F.2d 625 (8th Cir.1991); *Danzig Claimants v. Grynberg (In re Grynberg),* 113 B.R. 709, 712 (Bankr.D.Colo.1990); *In re Johns–Manville Corp.,* 57 B.R. 680, 690 (Bankr.S.D.N.Y.1986) (applying the standard in the asbestos liability context). Thus, under this "underlying act" or "debt-

or's conduct" approach, even if the EPA does not yet know of a potential CERCLA claim against the debtor, the debtor's liability is discharged so long as the debtor's conduct relating to the contamination concluded prior to its bankruptcy petition. Rather than looking to substantive non-bankruptcy law to determine when a CERCLA claim arises, these courts emphasize substantive bankruptcy law and policy.

This underlying act standard has been criticized as patently unfair to creditors because it would allow a polluting party to undergo bankruptcy proceedings and receive a discharge from any liabilities before the EPA-or any other credit– ever has a reason to know about the debtor's involvement in the release or threatened release of hazardous waste. *See, e.g., In re Chicago,* 974 F.2d at 784. Indeed, "despite Congress' repeal of the 'provability' requirement and the broad definition of 'claim,' nothing in the legislative history or the Code suggests ... Congressional intent to discharge a creditor's rights before the creditor knew or should have known that its rights existed." *Jensen,* 995 F.2d at 930 (quoting Saville, *supra,* at 349).

This approach also has been criticized for hindering several of CERCLA's goals. *See, e.g., id.* (quoting Saville, *supra,* at 350). CERCLA's central purposes are to protect public health and safety by facilitating an expeditious cleanup of hazardous waste and to hold polluters accountable for their actions. Saville, *supra,* at 327 (citing H.R. Rep. 96–1016(I), at *21 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6124–25, 1980 WL 12937; H.R.Rep. No. 99–253(III), at *20 (1985), *reprinted in* 1986 U.S.C.C.A.N. 3038, 3043, 1985 WL 25941). By employing the underlying acts standard, however, certain polluters would be able to escape responsibility by filing for bankruptcy after polluting but before the EPA knew of their actions, thereby nullify-

ing CERCLA's polluter accountability goal. In addition, CERCLA's goal of having as large a group of potentially responsible parties ("PRPs") as possible join together in paying response costs would be thwarted, with some PRPs being left to shoulder the debtor's burden.

Moreover, the underlying acts approach, if widely implemented, could have the unintended effect of causing the EPA to divert its energies from cleaning up sites to determining a debtor's potential status as a responsible party and, if so, filing a proof of claim and participating in the debtor's bankruptcy proceedings. Given the limited budget of the EPA, requiring the EPA to become embroiled in bankruptcy proceedings in order to maintain its ability to hold polluters responsible constitutes a wasteful allocation of resources. *See* Saville, *supra,* at 351 ("Allowing the courts to control the priority of the EPA's response as well as the scope and magnitude of the debtor's CERCLA liability could undermine CERCLA's goal of expeditiously and effectively cleaning up the environment.").

Additionally, this approach may discourage settlement agreements between polluters and the EPA, thereby diminishing the likelihood of a quick cleanup paid for by the polluters. Settlements heretofore offered an enticement to polluters because they could resolve their liability to the EPA without resorting to costly litigation. In addition, settlers obtain protection from lawsuits by co-contributors pursuant to 42 U.S.C. § 96013(f)(2). The EPA is willing to offer settlement because such agreements typically speed up reclamation efforts and because settling polluters can identify other responsible parties, the types and amounts of toxins used, and other pertinent information. Pursuant to the underlying acts approach, however, by entering into bankruptcy as soon as a par-

ty realizes it may be responsible for a hazardous waste release, the polluter can avoid liability without having to pay any of the response costs associated with settlement. *See* Saville, *supra*, at 352. And while settlement agreements generally only release the polluter from known liability, bankruptcy offers the additional benefit of release from any contingent liability. *See id.* Thus, under the underlying acts approach, the polluter/debtor will have much less of an incentive to settle with the EPA, which in turn will impede the EPA's cleanup efforts and thwart CERCLA's goal of efficient, expedited cleanups of environmental contamination.

The underlying acts approach also risks violating the EPA's (or other creditors') right to reasonable notice prior to the discharge of a claim. Both as a matter of constitutional law and statutory enactment, all creditors, including the EPA, are entitled to notice by a debtor prior to the debtor's liability being discharged by the bankruptcy court. *See generally* 11 U.S.C. §§ 1109(b), 1128(a); *City of New York v. New York, N.H. & H. R.R.,* 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953) (applying to the bankruptcy context the due process notice requirement articulated in *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950)); *Chemetron Corp. v. Jones,* 72 F.3d 341, 348 (3d Cir.1995); *In re Savage Indus.,* 43 F.3d 714, 721 (1st Cir.1994). The debtor is unlikely to identify the EPA as a creditor if it has no knowledge of its potential CERCLA liability. Thus, the EPA (or any other creditor) will not receive the type of notice required both by the Constitution and the Bankruptcy Code. *See, e.g., In re Hexcel Corp.,* 239 B.R. 564, 570–72 (N.D.Cal.1999); *In re Kewanee Boiler Corp.,* 198 B.R. 519, 528–29 (Bankr.N.D.Ill. 1996); *In re Pettibone,* 162 B.R. 791, 808 (Bankr.N.D.Ill.1994) ("The Bankruptcy Code does not require a party ... with no known interest in a bankruptcy proceeding

to monitor national financial papers and read notices about businesses against which they have no known claims to guard against the possibility they might later be held [to] notice of [a] claim[s] bar.").

### c. *Debtor–Creditor Relationship Approach*

A few courts have adopted a third approach, known as the "debtor-creditor relationship" standard, for determining when a CERCLA claim arises. This standard posits that any CERCLA liability is discharged if the creditor and debtor began a relationship before the debtor filed for bankruptcy, so long as the underlying act occurred before the bankruptcy petition was filed. *See United States v. LTV Corp. (In re Chateaugay Corp.),* 944 F.2d 997 (2d Cir.1991); *Pettibone Corp. v. Ramirez (In re Pettibone Corp.),* 90 B.R. 918, 931–33 (Bankr.N.D.Ill.1988); Saville, *supra,* 76 Minn. L.Rev. at 343–45; *see also In re Piper Aircraft, Corp.,* 58 F.3d 1573, 1577 (11th Cir.1995) (stating, in the context of product liability claims, that "the debtor's prepetition conduct gives rise to a claim ... only if there is a relationship established before [bankruptcy] confirmation between an identifiable claimant or group of claimants and that prepetition conduct"); *Roach v. Edge (In re Edge),* 60 B.R. 690, 699 (Bankr.M.D.Tenn.1986) (holding, in a dental malpractice context, that a bankruptcy claim arose at the earliest point in the relationship between the victim and the wrongdoer, not when the victim actually discovered her injuries). The Second Circuit, in *In re Chateaugay Corp.,* found that discharge of CERCLA liability was appropriate despite the EPA's lack of knowledge of the full extent of the hazardous waste dumped by or removal costs attributable to the debtor because of the relationship between the EPA and LTV, the debtor. *See In re Chateaugay Corp.,* 944 F.2d at 1005 ("Though there

does not yet exist between EPA and LTV the degree of relationship between claimant and debtor typical of an existing though unmatured contract claim, the relationship is far closer than that existing between future tort claimants totally unaware of injury and a tort-feasor. EPA is acutely aware of LTV and vice versa."). Indeed, the Second Circuit continued, the regulatory relationship between the EPA and those subject to regulation in and of itself is sufficient "to bring most ultimately maturing payment obligations based on pre-petition conduct within the definition of 'claims.'" *Id.*

The primary criticism of this approach is that courts using the relationship test, such as *In Re Chateaugay Corp.*, have defined "relationship" so broadly that they have made it the equivalent of the underlying acts approach:

> By broadly defining the relationship, the court[s have] undermined the rationale for considering whether or not a relationship exists-that a creditor with a relationship may anticipate its potential claim. All claims arising after this debtor-creditor relationship is known to exist, even those that are not within the creditor's contemplation, will be discharged. When courts fail to limit the scope of the relationship to situations where some prepetition interaction between the PRP and the EPA existed, this expansive relationship approach takes on the characteristics of and thus suffers from the same infirmities as the 'underlying acts' approach.

Saville, *supra*, at 353. Therefore, application of the debtor-creditor relationship test results in the same problems as those of the underlying acts approach described above.

#### d. *Fair Contemplation Approach*

Reflecting on the shortcomings of the first three approaches, subsequent courts and commentators have developed an alternative standard seeking to accommodate the policy aims of both bankruptcy law and CERCLA. This "fair contemplation" or "foreseeability" standard posits that a contingent CERCLA claim arises pre-petition only if it is "based upon pre-petition conduct that can fairly be contemplated by the parties at the time of the debtors' bankruptcy." *Jensen,* 995 F.2d at 930 (quoting *In re Nat'l Gypsum Co.,* 139 B.R. 397, 404 (N.D.Tex.1992)). Thus, a claim accrues when the potential CERCLA claimant, at the time of bankruptcy, "could have ascertained through the exercise of reasonable diligence that it had a claim" against the debtor for a hazardous release. *In re Crystal Oil Co.,* 158 F.3d 291, 296 (5th Cir.1998); *see also AM Int'l, Inc. v. Datacard Corp., DBS, Inc.,* 106 F.3d 1342, 1347–48 (7th Cir.1997); *In re Chicago,* 974 F.2d at 786 (holding, for discharge purposes, that a CERCLA claim arises when the claimant can "tie the bankruptcy debtor to a known release of a hazardous substance which this potential claimant knows will lead to CERCLA response costs."); *NCL Corp. v. Lone Star Bldg. Ctrs., Inc.,* 144 B.R. 170 (S.D.Fla.1992); *Sylvester Bros. Dev. Co. v. Burlington Northern R.R.,* 133 B.R. 648, 653 (D.Minn.1991) (in which the *Union Scrap* judge applied a fair contemplation standard instead of its prior right to payment approach); *Reynolds Bros.,* 647 N.E.2d at 1208; Saville, *supra,* at 354 (proposing that courts should discharge CERCLA liability only when such liability was foreseeable at the conclusion of the debtor's bankruptcy proceedings).

This standard allows a claim to accrue earlier than the right to payment standard because the potential claimant need not incur response costs (the fourth CERCLA element) for a contingent claim to arise under this standard. At the same time, the standard requires more awareness of a potential CERCLA claim by a potential

creditor than do the underlying act or debtor-creditor relationship standards, both of which allow claims to accrue even if the potential creditor had no idea that it might have a CERCLA claim against the debtor. In so doing, this standard attempts to reconcile the goals of both the bankruptcy courts and CERCLA. *See In re Chicago,* 974 F.2d at 787 ("In fact, any other conclusion would frustrate the bankruptcy court's interest in having all claims before it, and any other conclusion would frustrate CERCLA's goal of providing a speedy cleanup of hazardous sites."); *see also Jensen,* 995 F.2d at 930 (stating that the fair contemplation standard carefully balances the sometimes competing goals of environmental law and the bankruptcy code).

Courts and commentators have offered little criticism for the fair contemplation approach. In fact, the only direct criticism of this approach argues that the approach, which is rooted in a contractual standard, is inapposite to the CERCLA claim context due to the regulatory, involuntary relationship between the EPA and the debtor. *See* Philippe J. Kahn, *Bankruptcy Versus Environmental Protection: Discharging Future CERCLA Liability In Chapter 11,* 14 Cardozo L.Rev.1999, 2029–30 (May 1993) ("To characterize the EPA's relationship with the debtor as akin to a contractual relationship ignores the absence of a voluntary relationship, a bargained-for obligation ...."). Indeed, the approach does not appear to fit perfectly with situations such as the instant case, when the debtor's potential liability cannot be ascertained for decades due to the scores of parties involved, many of whom cannot be identified until after litigation has commenced and discovery has occurred. *Cf. Jensen,* 995 F.2d at 931 (where the debtor's potential liability was readily apparent to the regulatory body prior to bankruptcy); *In re Chicago,* 974 F.2d 775 (same). Finally, in situations

where the debtor itself does not know of its potential CERCLA liability until well after the close of its bankruptcy proceedings because the debtor's liability stems from the wrongful conduct of a third party, applying a fair contemplation standard requiring contemplation by the EPA of the debtor's potential liability makes it highly unlikely that debtors will ever be able to discharge their contingent CERCLA liabilities through bankruptcy.

### e. *Adopting a Standard*

■ After reviewing the above theories, the Court finds the fair contemplation standard to be the appropriate standard to apply in the case at bar. It is the only test which tries to accommodate both the fresh start goal of bankruptcy and the speedy cleanup and polluter accountability CERCLA goals. Moreover, unlike other standards, the fair contemplation approach does not violate Fifth Amendment and Bankruptcy Code notice requirements because creditors must be aware of potential claims against debtors before such claims can be discharged. Finally, while this standard slightly prioritizes CERCLA's goals over the fresh start bankruptcy goal, the Court finds this prioritization to be justifiable.

Despite the fact that "[c]onflict and confusion are almost inevitable" in balancing CERCLA and bankruptcy goals, the Supreme Court requires that the conflicting objectives of CERCLA and bankruptcy to be reconciled whenever possible. *Jensen,* 995 F.2d at 928 (citing, *inter alia, Midlantic Nat'l Bank v. New Jersey Dep't. Of Envt'l. Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986); *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985)); *see also In re Nat'l Gypsum Co.,* 139 B.R. at 404 ("[I]t is not a question of which statute should be accorded primacy over the

other, but rather what interaction between the two statutes serves most faithfully the policy objectives embodied in the two separate enactments of Congress"). Neither the right to payment approach, the underlying act approach, nor the relationship approach attempt to address this requirement of reconciliation. Only the fair contemplation approach embraces and attempts to balance the sometimes competing goals of CERCLA and the Bankruptcy Code. *See Jensen*, 995 F.2d at 930 (citing *In re Nat'l Gypsum*, 139 B.R. at 409); *Mesiti v. Microdot, Inc.*, 156 B.R. 113, 117 (D.N.H. 1993) (stating that the "preferred means of" reconciling the competing policy objectives of CERCLA and the Bankruptcy Code "involves judicial application of a 'foreseeability' test when deciding whether post-bankruptcy CERCLA claims are discharged") (citations omitted).

Additionally, the fair contemplation approach does not suffer from the notice infirmities of the underlying act and relationship approaches. Whereas the latter approaches, as mentioned above, do not provide adequate notice to potential creditors that their CERCLA claims are being discharged, the former approach only allows for discharge when the creditor contemplates the existence of such a claim prior to the debtor's bankruptcy filing. Indeed, the existence of due process and Code concerns about meaningful notice "bolsters the conclusion that a future claim that cannot be contemplated by the parties is not discharged under the Bankruptcy Code, even if that claim stems from the pre-petition conduct of the debtor." *In re Hexcel Corp.*, 239 B.R. 564, 572 (N.D.Cal. 1999). Thus, the notice requirement for discharge of liabilities in bankruptcy is honored, if not amplified, by the fair contemplation approach.

The Court recognizes that any approach adopted will invariably favor either CERCLA or bankruptcy goals, as a perfectly equitable balance between the two is simply unattainable.[4] *See, e.g.,* John C. Ryland, *When Policies Collide: The Conflict Between the Bankruptcy Code and CERCLA*, 24 Mem. St. U.L.Rev. 739, 772 ("While the ultimate goal is for the Code and CERCLA to interact and still achieve their legislative goals, it is apparent that any solution will, to some extent, involve the subordination of one act's interests for those of the other."). Given this reality, the Court prefers to favor slightly CERCLA's goals of speedy cleanup and polluter accountability over the fresh start goal of bankruptcy. Several reasons inform this conclusion. First, removing hazardous waste from the environment as expeditiously as possible implicates public health and safety concerns to an extent not extant in bankruptcy's purely economic fresh start goal. *See id.* ("Cleaning up the environment to preserve the public's health and safety should outweigh the economic interests of polluters who seek to avoid environmental cleanup liability in bankruptcy.").

---

4. Indeed, the only alternative approach that would embrace CERCLA's goals without compromising bankruptcy's goals would be to establish a trust fund for future potential but as yet unknown CERCLA claimants and the appointment of a claim representative to protect the interests of these claimants during the bankruptcy confirmation process, such as occurs within the context of mass tort bankruptcy proceedings. *See, e.g., Hexcel*, 239 B.R. at 571 (noting the absence of such a future-oriented mechanism in connection with CERCLA-related bankruptcy proceedings). Bankruptcy courts adjudicating reorganization proceedings, however, and not this Court, must determine whether to provide a trust and representative for potential future CERCLA claims; this Court cannot retroactively undo MDL's bankruptcy reorganization.

Second, the fresh start goal represents only one of the Code's overall goals. As one commentator asserts, another central purpose of bankruptcy is to provide creditors with the maximum recovery on their claims. *See* Kahn, *supra*, at 2052. The fair contemplation approach may actually support this bankruptcy goal because "including uncertain future CERCLA claims in the bankruptcy plan may entail added transaction costs that place an additional drain on the debtor company and actually diminish the creditors' recovery." *Id.* at 2052–53. Moreover, "allowing such contingent claims may unnecessarily burden the bankruptcy plan with liabilities that never accrue." *Id.* at 2046 (citing *In re Hemingway Transp., Inc.,* 126 B.R. 656, 661 (D.Mass.1991)). Further, when evaluating which bankruptcy goal should predominate, some commentators have opined that the fresh start policy applies in the context of individual bankruptcy but not, as in the case *sub judice,* in the context of continuing corporations seeking reorganization. *See id.* at 2034–35 (citations omitted); *see also Grogan,* 498 U.S. at 286, 111 S.Ct. 654 (noting that the fresh start policy is not absolute); Hon. Edith H. Jones, *Chapter 11: A Death Penalty for Debtor and Creditor Interests,* 77 Cornell L.Rev. 1088, 1088, 1090 (1992) (stating that the fresh start policy does not apply in the business reorganization context). Therefore, when trying to achieve a synthesis between CERCLA and bankruptcy goals, the fair contemplation approach becomes all the more apposite.

Third, while the fair contemplation standard may diminish the number of claims a debtor can discharge through bankruptcy, "a debtor has no Constitutional or 'fundamental' right to a discharge in bankrupt-

cy." *Grogan,* 498 U.S. at 286, 111 S.Ct. 654 (citing *United States v. Kras,* 409 U.S. 434, 445–46, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973)). Fourth, in evaluating whether to favor slightly the interests of CERCLA (and thus the creditor) or bankruptcy law (and thus the debtor), the fact that debtors may abuse bankruptcy discharges to hide from liability presents more of a concern than the likelihood that the EPA (or other creditors) will abuse their power under the fair contemplation standard to feign ignorance of debtors' involvement in order to preserve claims post-bankruptcy. In sum, numerous reasons support adopting a fair contemplation standard which slightly favors CERCLA's public health and safety goals over bankruptcy's fresh start goal in determining when a claim should arise for purposes of bankruptcy discharge. As a result, this Court adopts the fair contemplation standard as the best approach for courts to take.

3. *Applying the Fair Contemplation Standard to the Complaint and MDL's Motion*

■ MDL's bankruptcy reorganization plan was finalized in 1986. *See In re Mason & Dixon Lines, Inc.,* 63 B.R. 176, 15 Collier Bankr.Cas.2d 418 (Bankr. M.D.N.C.1986).[5] Nothing in the Complaint or in MDL's bankruptcy reorganization order suggests that, as of that time, the EPA fairly contemplated or had reason to foresee MDL's potential liability to the EPA for the Gurley Sites. *See* Compl. ¶¶ 59–71. Without additional facts, the Court cannot conclude that the EPA had a contingent claim against MDL at the time MDL discharged its "claims" in its bankruptcy reorganization. Thus, MDL, as the moving party, has failed to meet its burden

5. While extrinsic evidence is generally not considered when adjudicating a Fed. R.Civ. P. 12(b)(6) motion, the Court may take judicial notice of pertinent matters of public record

such as MDL's bankruptcy order. *See United States v. Wood,* 925 F.2d 1580, 1582 (7th Cir.1991) (citations omitted); Wright & Miller, *supra,* § 1357.

of proof showing that the EPA fairly contemplated MDL's potential liability prior to MDL's 1986 Chapter 11 reorganization. Accordingly, the Court must deny MDL's motion, without prejudice to its right to submit a properly supported motion for summary judgment, using the fair contemplation standard set forth herein.

## IV. *Conclusions*

For the above-state reasons, having construed MDL's motion as a motion to dismiss for failure to state a claim, this Court **DENIES** MDL's motion for judgment on the pleadings.